(Nos. 105971, 105984 cons.—

POOH-BAH ENTERPRISES, INC., d/b/a Crazy Horse Too, Appellee, v. THE COUNTY OF COOK *et al.*, Appellants.

*Opinion filed March 19, 2009.*

Richard A. Devine and Anita Alvarez, State's Attorneys, of Chicago (Patrick T. Driscoll, Jr., Michael C. Prinzi and Paul A. Castiglione, Assistant State's Attorneys, of counsel), for appellants County of Cook and Barbara Bruno as Director of the Cook County Department of Revenue.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper and Nadine J. Wichern, of counsel), for appellant City of Chicago.

Michael A. Abramson and Georgia Logothetis, of Arnstein & Lehr, LLP, and David A. Epstein, all of Chicago, for appellee.

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

At issue is whether the small venue exemptions to the amusement tax ordinances of defendants Cook County and the City of Chicago violate the first amendment to the United States Constitution (U.S. Const., amend. I) or the free speech clause of the Illinois

Constitution (Ill. Const. 1970, art. I, §4). We hold that they do not.

## BACKGROUND

The City of Chicago and Cook County have substantially similar amusement tax ordinances with substantially similar small venue exemptions. The amusement tax is imposed upon the admission fee to enter, witness, view or participate in any "amusement" as defined by ordinance. Cook County Amusement Tax Ordinance §3 (1999); Chicago Municipal Code §4—156—020(A) (2008). Under the City's ordinance, an amusement is:

"(1) any exhibition, performance, presentation or show for entertainment purposes, *** including, but not limited to, any theatrical, dramatic, musical or spectacular performance, promotional show, motion picture show, flower, poultry or animal show, animal act, circus, rodeo, athletic contest, sport, game or similar exhibition such as boxing, wrestling, skating, dancing, swimming, racing or riding on animals or vehicles, baseball, basketball, softball, football, tennis, golf, hockey, track and field games, bowling, or billiard and pool games; (2) any entertainment or recreational activity offered for public participation or on a membership or other basis including, but not limited to, carnivals, amusement park rides and games, bowling, billiards and pool games, dancing, tennis, racquetball, swimming, weightlifting, bodybuilding or similar activities; or (3) any paid television programming, whether transmitted by wire, cable, fiberoptics, laser, microwave, radio, satellite or similar means." Chicago Municipal Code §4—156—010 (2008).

The County's definition is similar. See Cook County Amusement Tax Ordinance §2 (1999). Operators of amusements are responsible for collecting the taxes from patrons, keeping accurate books and records, and remitting the taxes on a monthly basis. Cook County Amusement Tax Ordinance §5 (1999); Chicago Municipal Code §4—156—030 (2008).

Effective January 1, 1999, the City and the County

amended their respective ordinances to add small venue exemptions. These exemptions apply to "live theatrical, live musical or other live cultural performances" that take place in a space with a maximum capacity of not more than 750 people." Cook County Amusement Tax Ordinance §3(D)(1) (1999); Chicago Municipal Code §4—156—020 (West 2008). The following preamble accompanied the County's amendment: "WHEREAS, it is the intent of the County Board to foster the production of live performances that offer theatrical, musical or cultural enrichment to the people of Cook County." Cook County Board of Commissioner's Resolution, November 17, 1998, amending the amusement tax ordinance. The City Council Journal entry accompanying passage of the amendment to the city's ordinance includes the following statements:

"WHEREAS, The City Council wishes to foster the production of live performances that offer theatrical, musical or cultural enrichment to the city's residents and visitors; and

WHEREAS, Small theaters and other small venues often promote the local production of new and creative live cultural performances, and often have the most difficulty absorbing or passing on any additional costs; and

WHEREAS, Costs faced by those who produce live theatrical, musical, or other culturally enriching performances at smaller venues are substantial, and such performances often require governmental support since they could not otherwise flourish[.]" City Council Journal Entry, November 12, 1998, amending §4—156—020(D).

Defendants later amended their respective ordinances to define "live theatrical, live musical or other live cultural performance" as:

"a live performance in any of the disciplines which are commonly regarded as part of the fine arts, such as live theater, music, opera, drama, comedy, ballet, modern or traditional dance, and book or poetry readings. This term does not include such amusements as athletic events, races or performances conducted at adult entertainment cabarets

[as defined by local ordinance]." Cook County Amusement Tax Ordinance §2 (1999); Chicago Municipal Code §4—156—010 (2008).

The County's zoning ordinance defines "adult entertainment cabaret" to mean:

"A public or private establishment which features topless dancers, strippers, male or female impersonators or other entertainers who:

A. Display or simulate the display of 'specified anatomical areas;' [*sic*]

B. Perform in a manner which is designed primarily to appeal to the prurient interest of a patron or person; or

C. Engage in, or engage in simulation of, 'specified sexual activities.' " Cook County Zoning Ordinance of 2001, art. 14.2.1 (2006).

"Specified sexual activities" are defined as:

"A. Human genitals in a state of sexual stimulation or arousal.

B. Acts of human masturbation, sexual intercourse or sodomy.

C. Fondling or other erotic touching of human genitals, pubic regions, buttocks or female breasts." Cook County Zoning Ordinance of 2001, art. 14.2.1 (2006).

"Specified anatomical areas" are defined as:

"A. Anatomical areas if less than completely and opaquely covered by a bathing suit, blouse, shirt, dress, pants, leotard or other wearing apparel or fabric.

1. Any portion of the genitals or pubic region.

2. Any portion of the buttocks.

3. Female breast(s) below a horizontal line across the breast at a point immediately above the top of the areola, including the entire lower portion of the female breast, but shall not include any portion of the cleavage of the female breast.

B. Genitals in a discernible turgid state, even if completely and opaquely covered.

C. Paint, latex or other non-fabric coverings shall not satisfy the requirement of coverage, irrespective of whether the coverage is complete or opaque." Cook County Zoning Ordinance of 2001, art. 14.2.1 (2006).

The City's adult use ordinance contains similar definitions of "adult entertainment cabaret," "specified sexual activities," and "specified anatomical areas." See Chicago Municipal Code §16—16—030 (2005).

In 2001, plaintiff, Pooh-Bah Enterprises, Inc., brought suit, in the circuit court of Cook County, for declaratory and injunctive relief against the County. In its complaint, plaintiff alleged that it operates an establishment under the licensed name "Crazy Horse Too." The seating capacity of plaintiff's establishment is less than 750 persons. At the establishment, scantily clad (but not completely nude) women give live performances of exotic dancing. Plaintiff stated that it had claimed the small venue exemption because the live performances at its establishment qualify as being "live theatrical, live musical, or other live cultural performances." Plaintiff claimed that its entertainment qualified either as "modern or traditional dance" or "other live cultural performances." The County denied plaintiff the exemption on the basis that the dance performances are "performances conducted at adult entertainment cabarets." Plaintiff conceded that its dancers display "specified anatomical areas" as defined in the zoning ordinance. Plaintiff argued that the amusement tax ordinance violated the first and fourteenth amendments to the United States Constitution because it discriminated on the basis of content. Plaintiff cited *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 95 L. Ed. 2d 209, 107 S. Ct. 1722 (1987), for the proposition that discrimination in taxation based on content violates the first and fourteenth amendments unless it is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. Plaintiff alleged in a separate count that the tax ordinance was overbroad in violation of the first and fourteenth amendments. Plaintiff later amended the complaint to add claims under the free speech clause of the Illinois Constitution.

The City moved to intervene on the basis that its amusement tax ordinance and small venue exemption are identical to the County's. The court granted the motion. Plaintiff then filed a second amended complaint, adding claims under the first amendment and the free speech clause against the City. In addition, plaintiff added vagueness challenges against both defendants.

Defendants moved to dismiss the second amended complaint pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2006)), alleging that it did not state any claims upon which relief could be granted. The circuit court granted the motion and dismissed the complaint in its entirety. Pertinent to the first amendment and free speech clause claims, the circuit court rejected plaintiff's argument that defendants had imposed a differential tax subject to strict scrutiny review. The circuit court found that this was not a tax that selected a narrow group to bear its burden fully, but was a generally applicable tax covering a broad range of amusements. The court found that the tax did not restrict, regulate, or prohibit exotic dance at plaintiff's establishment.

The circuit court upheld the small venue exemption under the reasoning of *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 76 L. Ed. 2d 129, 103 S. Ct. 1997 (1983), *Rust v. Sullivan*, 500 U.S. 173, 114 L. Ed. 2d 233, 111 S. Ct. 1759 (1991), and *National Endowment for the Arts v. Finley*, 524 U.S. 569, 141 L. Ed. 2d 500, 118 S. Ct. 2168 (1998). The circuit court noted that *Regan* held that tax exemptions are a "form of subsidy that is administered through the tax system," having "much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income." *Regan*, 461 U.S. at 544, 76 L. Ed. 2d at 136, 103 S. Ct. at 2000. After reviewing the facts and holdings of *Regan*, *Rust*, and *Finley*, the circuit court concluded as follows:

"What *Regan*, *Rust*, and *Finley* recognize is that state action which interferes is different from state action which encourages an alternative activity based on public policy. *Regan*, 461 U.S. at 545, *Rust*, 500 U.S. at 193, *Finley*, 524 U.S. at 588. The issue is not whether the City and County are interfering with exotic dancing at Pooh-Bah's bar but whether the City and County are required to subsidize that exotic dancing. The Small Venue Exemptions simply made a policy decision to subsidize small venues to 'foster the production of live performances that offer theatrical, musical or cultural enrichment.' See, City Council Journal Entry of 11/12/98, amending §4—156—020(D) and Cook County Board of Commissioner's resolution to amend CATO effective February 1, 1997. The City and County are not engaging in discrimination based on viewpoint or content; they are merely choosing to fund one activity to the exclusion of another."

The circuit court further concluded that the ordinances were neither overbroad nor vague.

Plaintiff moved to reconsider and to file a third amended complaint adding two counts alleging violations of the uniformity clause (Ill. Const. 1970, art. IX, §2) of the Illinois Constitution. The court allowed Pooh-Bah to amend its complaint, and then denied reconsideration of its earlier ruling and dismissed the uniformity clause claims.

Plaintiff appealed, and the appellate court reversed. 378 Ill. App. 3d 268. On appeal, plaintiff argued that defendants' ordinances: (1) violate the first amendment of the United States Constitution; (2) violate the free speech clause of the Illinois Constitution; (3) are overbroad; (4) are vague; and (5) violate the uniformity clause of the Illinois Constitution. The appellate court reached only the first issue, reversing the circuit court on the basis that the ordinances violate the first amendment because they contain content-based regulations on speech that do not serve a compelling state interest. Although acknowledging that "[t]he only question

presented by a section 2—615 motion to dismiss for failure to state a cause of action is whether sufficient facts are stated in the complaint which, if true, could entitle the plaintiff to relief" (378 Ill. App. 3d at 272), the appellate court decided the first issue on the merits.[1] The appellate court first determined that the small venue exemptions to the amusement tax ordinances were not content neutral because one can only tell if something is an "adult entertainment cabaret" by considering the content of the expression featured at the establishment. 378 Ill. App. 3d at 276. Thus, the appellate court concluded that it was dealing with a content-based differential tax on erotic dance, and therefore strict scrutiny review applied. 378 Ill. App. 3d at 276. In a section of its opinion entitled "Compelling Interest," the appellate court reviewed *Regan*, *Rust*, and *Finley* and found them inapplicable. The court held that "*Regan*, *Rust*, and *Finley* do not establish that the government can encourage one private speaker over another based on content or message without implicating first amendment concerns." 378 Ill. App. 3d at 277. The court then held that it could find no compelling state interest that would justify the adult entertainment cabaret exclusions in the amusement tax ordinances. Accordingly, the court held that the small venue exemptions violated the first amendment. Because of its resolution of this issue, the court did not consider plaintiff's remaining arguments. 378 Ill. App. 3d at 279.

We allowed defendants' petitions for leave to appeal. 210 Ill. 2d R. 315.

---

[1] Defendants point out that, because they moved to dismiss on the pleadings, they had not even been given a chance to assert a compelling state interest. Defendants argue that, if plaintiff's complaint is found to state a cause of action, the cause should be remanded so that they may address the strict scrutiny standard.

ANALYSIS

A section 2—615 motion to dismiss challenges the legal sufficiency of a complaint based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). A cause of action should not be dismissed pursuant to a section 2—615 motion unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Canel v. Topinka*, 212 Ill. 2d 311, 318 (2004). In ruling on such a motion, only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record may be considered. *Mt. Zion Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 115 (1995). We accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts. *Marshall*, 222 Ill. 2d at 429. However, a plaintiff may not rely on mere conclusions of law or fact unsupported by specific factual allegations. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 408 (1996). We review *de novo* an order granting a section 2—615 motion to dismiss. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003).

Although plaintiff labeled its challenge as both facial and as-applied, we agree with defendants that there is no discernable as-applied challenge in plaintiff's complaint. Rather, the complaint challenges the statute as unconstitutional on its face, and this was the basis of the appellate court's holding. "Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the court sparingly and only as a last resort.' " *Finley*, 524 U.S. at 580, 141 L. Ed. 2d at 511, 118 S. Ct. at 2175, quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 37 L. Ed. 2d 830, 841, 93 S. Ct. 2908, 2916 (1973). A party raising a facial challenge under the free speech clause of the first amendment "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *Finley*, 524 U.S. at 580, 141 L. Ed. 2d at 511, 118 S. Ct. at 2175.

Defendants do not dispute that the dancers who perform at plaintiff's establishment are engaging in conduct protected by the first amendment. Erotic dancing of the sort practiced at plaintiff's establishment is protected by the first amendment, although the Supreme Court has described it as falling only within the outer ambit of the first amendment's protection. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 146 L. Ed. 2d 265, 278, 120 S. Ct. 1382, 1391 (2000); see also *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66, 115 L. Ed. 2d 504, 511, 111 S. Ct. 2456, 2460 (1991) (plurality opinion) (describing such activity as "expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so"). The parties disagree vehemently over which line of first amendment cases apply to the facts of this case. The following passage from a recent first amendment case, *Davenport v. Washington Education Ass'n*, 551 U.S. 177, 188-89, 168 L. Ed. 2d 71, 81-82, 127 S. Ct. 2372, 2381 (2007), sets forth the difference:

"It is true enough that content-based regulations of speech are presumptively invalid. See, *e.g.*, *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992) (citing cases). We have recognized, however, that '[t]he rationale of the general prohibition ... is that content discrimination "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." ' *Id.*, at 387 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). And we have identified numerous situations in which that risk is inconsequential, so that strict scrutiny is unwarranted. *** Of particular relevance here, our cases recognize that the risk that content-based distinctions will impermissibly interfere with the marketplace of ideas is sometimes attenuated when the government is acting in a capacity other than as regulator. Accordingly, it is well established that the government can make content-based distinctions when it subsidizes speech. See, *e.g.*, *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 548-550 (1983)."

Plaintiff argues, and the appellate court held, that

the small venue exemptions in the defendants' amusement tax ordinances are presumptively invalid content-based discriminatory taxes. Thus, plaintiff contends that the relevant cases are those involving differential taxation based on content, and the ordinances may not be upheld unless they pass strict scrutiny review. Defendants argue, and the trial court found, that all that has happened here is that defendants have made permissible content-based distinctions when they subsidized speech. Defendants argue that the first amendment is not a suicide pact that means that the government may not subsidize the fine arts unless it is also willing to subsidize activities that are known to have negative secondary effects. Accordingly, defendants contend that, under the line of cases allowing government to subsidize one activity to the exclusion of another, plaintiff's complaint does not state a claim upon which relief can be granted. We will now review some of the major decisions from these two lines of cases.

### Government Speech/Subsidy Cases

In *Regan*, a nonprofit corporation, Taxation With Representation of Washington (TWR), was denied tax-exempt status under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. §501(c)(3)) because the Internal Revenue Service determined that a substantial part of its activities would consist of attempts to influence legislation. Under section 501(c)(3), tax-exempt status was not available to any organization if a substantial part of its activities consisted of attempting to influence legislation. TWR brought a declaratory judgment action, claiming that section 501(c)(3)'s prohibition against substantial lobbying violated the first amendment. Relying on *Speiser v. Randall*, 357 U.S. 513, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958), TWR argued that section 501(c)(3) imposed an unconstitutional condition and that to " 'deny an exemption to claimants who engage in certain forms of speech

is in effect to penalize them for [the same] speech.' " *Regan*, 461 U.S. at 545, 76 L. Ed. 2d at 136, 103 S. Ct. at 2001, quoting *Speiser*, 357 U.S. at 518, 2 L. Ed. 2d at 1468, 78 S. Ct. at 1338. The Supreme Court agreed with TWR that government may not deny a benefit to a person because he engages in speech, but denied that that had happened in the case before it. The Supreme Court explained that "[b]oth tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income." *Regan*, 461 U.S. at 544, 76 L. Ed. 2d at 136, 103 S. Ct. at 2000. Thus, the Supreme Court concluded that Congress had not infringed any constitutional rights or regulated any first amendment activity. It had "simply chosen not to pay for TWR's lobbying." *Regan*, 461 U.S. at 546, 76 L. Ed. 2d at 137, 103 S. Ct. at 2001. The Court also rejected the Court of Appeals' view that strict scrutiny applies whenever a statute affects " 'first amendment rights on a discriminatory basis.' " *Regan*, 461 U.S. at 548, 76 L. Ed. 2d at 138, 103 S. Ct. at 2002. The Court explained that strict scrutiny does not apply every time Congress subsidizes some speech but not all speech, and that "Congressional selection of particular entities or persons for entitlement to this sort of largesse 'is obviously a matter of policy and discretion not open to judicial review unless in circumstances which here we are not able to find.' " *Regan*, 461 U.S. at 549, 76 L. Ed. 2d at 139, 103 S. Ct. at 2002-03, quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 317, 81 L. Ed. 1122, 1130, 57 S. Ct. 764, 768 (1937).

*Rust* involved a facial challenge to Department of Health and Human Services regulations that limit the ability of Title X recipients to engage in abortion-related activities. Title X of the Public Health Service Act

provides federal funding for family-planning services, but section 1008 of the Act provides that " '[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.' " *Rust*, 500 U.S. at 178, 114 L. Ed. 2d at 246, 111 S. Ct. at 1765, quoting 42 U.S.C. §300a—6. Regulations later clarified that Congress intended Title X funds to be used only to support preventative family-planning services. *Rust*, 500 U.S. at 179, 114 L. Ed. 2d at 246, 111 S. Ct. at 1765. Regulations promulgated pursuant to Title X also specifically provided that Title X recipients could " 'not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning.' " *Rust*, 500 U.S. at 179, 114 L. Ed. 2d at 246, 111 S. Ct. at 1765, quoting 42 C.F.R. §59.8(a)(1) (1989).

A group of Title X grantees and doctors brought suit challenging the facial validity of the regulations and seeking declaratory and injunctive relief to prevent their implementation. The plaintiffs claimed, *inter alia*, that the regulations violated their first amendment rights by impermissibly discriminating based on viewpoint. They claimed that the regulations placed viewpoint-discriminatory conditions on government subsidies, thereby penalizing their free speech rights. The plaintiffs conceded that government may place certain conditions on the receipt of federal subsidies, but could not discriminate in such a manner as to aim at the suppression of dangerous ideas. *Rust*, 500 U.S. at 192, 114 L. Ed. 2d at 254-55, 111 S. Ct. at 1771-72.

The Court rejected the plaintiffs' argument, concluding that "[t]here is no question but that the statutory prohibition contained in §1008 is constitutional." *Rust*, 500 U.S. at 192, 114 L. Ed. 2d at 255, 111 S. Ct. at 1772. The Court explained:

"Here the Government is exercising the authority it possesses under *Maher* and *Harris v. McRae*, 448 U.S. 297

(1980), to subsidize family planning services which will lead to conception and childbirth, and declining to 'promote or encourage abortion.' The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. '[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.' *Regan, supra,* at 549. See also *Buckley v. Valeo,* 424 U.S. 1 (1976); *Cammarano v. United States, supra.* 'A refusal to fund protected activity, without more, cannot be equated with the imposition of a "penalty" on that activity.' *McRae, supra,* at 317, n.19. 'There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.' *Maher, supra,* at 475.

    \*\*\*

To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect. When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, 22 U.S.C. §4411(b), it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism. Petitioners' assertions ultimately boil down to the position that if the Government chooses to subsidize one protected right, it must subsidize analogous counterpart rights. But the Court has soundly rejected that proposition. *Regan v. Taxation with Representation of Wash., supra; Maher v. Roe, supra; Harris v. McRae, supra.* Within far broader limits than petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust,* 500

U.S. at 193-94, 114 L. Ed. 2d at 255-56, 111 S. Ct. at 1772-73.

The dissent argued unsuccessfully that "the counseling and referral provisions at issue *** constitute content-based regulation of speech." *Rust*, 500 U.S. at 209, 114 L. Ed. 2d at 266, 111 S. Ct. at 1781 (Blackmun, J., dissenting, joined by Marshall and Stevens, JJ.).

*Finley* involved a facial challenge to section 954(d)(1) of the National Foundation on the Arts and Humanities Act of 1965 (20 U.S.C. §954(d)(1)). This section requires the Chairperson of the National Endowment for the Arts (NEA) to ensure that "artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. §954(d)(1). The four people who brought the suit were performance artists who were initially recommended for NEA grants by an advisory panel, but then were denied funding after section 954(d)(1) was enacted. The Supreme Court found no first amendment violation, concluding that section 954(d)(1) would not give rise to suppression of protected expression:

> "Any content-based considerations that may be taken into account in the grant-making process are a consequence of the nature of arts funding. The NEA has limited resources, and it must deny the majority of the grant applications that it receives, including many that propose 'artistically excellent' projects." *Finley*, 524 U.S. at 585, 141 L. Ed. 2d at 514-15, 118 S. Ct. at 2177-78.

The Court explained that it would be a different case if "the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2178. This is because, even in the provision of subsidies, the "Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2178,

quoting *Regan*, 461 U.S. at 550, 76 L. Ed. 2d at 139, 103 S. Ct. at 2003. Moreover, the Court explained that "a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.' " *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2179, quoting *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105, 116, 116 L. Ed. 2d 476, 487, 112 S. Ct. 501, 508 (1991). However, the Court again reiterated that there is a difference between the government acting as regulator and the government subsidizing the arts:

"Finally, although the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake. So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities. See *Regan, supra,* at 549. In the 1990 amendments that incorporated §954(d)(1), Congress modified the declaration of purpose in the NEA's enabling Act to provide that arts funding should 'contribute to public support and confidence in the use of taxpayer funds,' and that '[p]ublic funds ... must ultimately serve public purposes the Congress defines.' §951(5). And as we held in *Rust,* Congress may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.' 500 U.S., at 193. In doing so, 'the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.' *Ibid.*; see also *Maher v. Roe*, 432 U.S. 464, 475 (1977) ('There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy')." *Finley*, 524 U.S. at 587-88, 141 L. Ed. 2d at 516-17, 118 S. Ct. at 2179.

Justices Scalia and Thomas concurred in the judgment. These justices concluded that section 954(d)(1) unquestionably discriminated on the basis of viewpoint, but found this to be perfectly constitutional in the subsidy context. Justices Scalia and Thomas argued that "[i]t is preposterous to equate the denial of taxpayer subsidy with measures ' " 'aimed at the *suppression* of dangerous ideas.' " ' " (Emphasis in original.) *Finley*, 524 U.S. at 596, 141 L. Ed. 2d at 522, 118 S. Ct. at 2183 (Scalia, J., concurring, joined by Thomas, J.), quoting *Regan*, 461 U.S. at 550, 76 L. Ed. 2d at 139, 103 S. Ct. at 2003, quoting *Commarano v. United States*, 358 U.S. 498, 513, 3 L. Ed. 2d 462, 472, 79 S. Ct. 524, 533 (1959), quoting *Speiser v. Randall*, 357 U.S. 513, 519, 2 L. Ed. 2d 1460, 1468, 78 S. Ct. 1332, 1338 (1958). The concurring justices would have held that there is a fundamental divide between abridging speech and funding other speech, and that the first amendment is inapplicable in the later situation. *Finley*, 524 U.S. at 599, 141 L. Ed. 2d at 523, 118 S. Ct. at 2184 (Scalia, J., concurring, joined by Thomas, J.). Justice Souter dissented, arguing that the provision amounted to unconstitutional viewpoint-based discrimination. *Finley*, 524 U.S. at 600-01, 141 L. Ed. 2d at 524-25, 118 S. Ct. at 2185 (Souter, J., dissenting).

In *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 132 L. Ed. 2d 700, 115 S. Ct. 2510 (1995), a University of Virginia student organization that published a Christian newspaper brought an action against the University, challenging its denial of funds from a fund specifically created by the University to make payments to outside contractors for the printing costs of student publications. Payment was withheld for the publication in question because it " 'primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality.' " *Rosenberger*, 515 U.S. at

822-23, 132 L. Ed. 2d at 711, 115 S. Ct. at 2513. The Supreme Court held that the University's denial of funds violated the students' rights under the free speech clause of the first amendment. The Court held that the University had created a limited public forum through its student activities fund, and, once it had done so, it could not discriminate on the basis of viewpoint. The Court stated that content discrimination may be permissible if it preserves the purposes of the limited forum, but viewpoint discrimination is presumed impermissible when directed against speech otherwise within the forum's limitation. *Rosenberger*, 515 U.S. at 829-30, 132 L. Ed. 2d at 715-16, 115 S. Ct. at 2516-17. The Court distinguished *Rust* on the grounds that, "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes," but that viewpoint-based restrictions were not "proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Rosenberger*, 515 U.S. at 833-34, 132 L. Ed. 2d at 718, 115 S. Ct. at 2519. Thus, the Court concluded that "[h]aving offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the University may not silence the expression of selected viewpoints." *Rosenberger*, 515 U.S. at 835, 132 L. Ed. 2d at 719, 115 S. Ct. at 2519.

*Legal Services Corp. v. Velazquez*, 531 U.S. 533, 149 L. Ed. 2d 63, 121 S. Ct. 1043 (2001), involved a first amendment challenge to a provision of the Legal Services Corporation Act (42 U.S.C. §2996 *et seq.*). The Act established a nonprofit corporation, the Legal Services Corporation (LSC), to distribute funds to provide financial support in noncriminal proceedings to people who cannot afford legal assistance. One of the provisions prohibited a lawyer working for an LSC grantee from

challenging existing welfare law. The provision had been interpreted to mean that an attorney could not argue that a state statute conflicts with a federal statute or that either a state or local statute is unconstitutional. Lawyers employed by New York City LSC grantees brought suit to declare this portion of the Act invalid because it instituted impermissible viewpoint-based discrimination in violation of the first amendment. *Velazquez*, 531 U.S. at 536-37, 149 L. Ed. 2d at 69, 121 S. Ct. at 1046.

In a 5-4 decision, the Supreme Court held that the statute violated the first amendment. The Court reiterated the principles that viewpoint-based funding decisions can be upheld when the government is the speaker or when the government uses private speakers to transmit information pertaining to its own program. The Court cautioned, however, that "[n]either the latitude for government speech nor its rationale applies to subsidies for private speech in every instance." *Velazquez*, 531 U.S. at 542, 149 L. Ed. 2d at 72, 121 S. Ct. at 1049. The Court explained that *Rosenberger* was such a situation because in that case the program was designed to encourage a diversity of views, and once it had opened up such a forum, the government could not engage in viewpoint-based discrimination. The Court again reiterated that "[w]hen the government creates a limited forum for speech, certain restrictions may be necessary to define the limits and purposes of the program. [Citations.] The same is true when the government establishes a subsidy for specified ends." *Velazquez*, 531 U.S. at 543, 149 L. Ed. 2d at 73-74, 121 S. Ct. at 1050. The Court then noted that this was a subsidy case rather than a limited forum case, but that the limited forum cases provided "some instruction." *Velazquez*, 531 U.S. at 544, 149 L. Ed. 2d at 74, 121 S. Ct. at 1050. The Court concluded that, because the purpose of the program was

to provide legal representation for those who could not afford it, once the Congress established such a program, it could not limit the arguments that lawyers could make because to do so would distort the legal system by altering the traditional role of LSC attorneys in advising their clients and presenting arguments. *Velazquez*, 531 U.S. at 544, 149 L. Ed. 2d at 74, 121 S. Ct. at 1050. The Court found problematic the "attempt to draw lines around the LSC program to exclude from litigation those arguments and theories that Congress finds unacceptable." *Velazquez*, 531 U.S. at 546, 149 L. Ed. 2d at 75, 121 S. Ct. at 1051. The Court explained that:

> "Congress was not required to fund an LSC attorney to represent indigent clients; and when it did so, it was not required to fund the whole range of legal representations or relationships. The LSC and the United States, however, in effect ask us to permit Congress to define the scope of the litigation it funds to exclude certain vital theories and ideas. The attempted restriction is designed to insulate the Government's interpretation of the Constitution from judicial challenge. The Constitution does not permit the Government to confine litigants and their attorneys in this manner." *Velazquez*, 531 U.S. at 548, 149 L. Ed. 2d at 76-77, 121 S. Ct. at 1052.

The Court distinguished *Rust* on the basis that advice from an attorney to his client and the advocacy by the attorney to the courts cannot be "classified as governmental speech even under a generous understanding of the concept." *Velazquez*, 531 U.S. at 542-43, 149 L. Ed. 2d at 73, 121 S. Ct. at 1049.

Justice Scalia, joined by Chief Justice Rehnquist, Justice O'Connor, and Justice Thomas, dissented, arguing that the majority's decision had no foundation in the Court's precedents because there had never been a "distorts an existing medium of expression" test. *Velazquez*, 531 U.S. at 555, 149 L. Ed. 2d at 81, 121 S. Ct. at 1056 (Scalia, J., dissenting, joined by Rehnquist, C.J., and O'Connor and Thomas, JJ.). The dissent would have

found the subsidy program perfectly constitutional because no coercion of belief was involved and there was no threat that the subsidy would " 'drive certain ideas or viewpoints from the marketplace.' " *Velazquez*, 531 U.S. at 552-53, 149 L. Ed. 2d at 79, 121 S. Ct. at 1054 (Scalia, J., dissenting, joined by Rehnquist, C.J., and O'Connor and Thomas, JJ.), quoting *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2178. The dissent found that the case was indistinguishable from *Rust*, and that the majority's attempt to distinguish *Rust* was "so unpersuasive it hardly needs response" because if "the private doctors' confidential advice to their patients *** in *Rust* constituted 'government speech,' it is hard to imagine what subsidized speech would *not* be government speech." (Emphasis in original.) *Velazquez*, 531 U.S. at 554, 149 L. Ed. 2d at 80, 121 S. Ct. at 1055 (Scalia, J., dissenting, joined by Rehnquist, C.J., and O'Connor and Thomas, JJ.).

Differential Tax Cases

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 75 L. Ed. 2d 295, 103 S. Ct. 1365 (1983), involved a challenge to a Minnesota use tax on the cost of paper and ink used in the production of publications. Ink and paper used in producing publications were the only items subject to the use tax that were components of goods to be sold at retail. The Minnesota legislature later amended the statute to exempt the first $100,000 worth of ink and paper consumed by a publication in any calendar year. After the exemption went into effect, only 11 publishers, producing 14 of the 388 paid circulation newspapers in the state, incurred a tax liability. *Minneapolis Star & Tribune Co.*, 460 U.S. at 577-79, 75 L. Ed. 2d at 299-300, 103 S. Ct. at 1367-68. The Supreme Court held that the tax statute violated the first amendment for two different reasons: (1) the tax singled out the press for special

treatment (*Minneapolis Star & Tribune Co.*, 460 U.S. at 582-89, 75 L. Ed. 2d at 302-07, 103 S. Ct. at 1370-74); and (2) the $100,000 exemption meant that only a handful of publishers paid any tax, and even fewer paid a significant amount of tax (*Minneapolis Star & Tribune Co.*, 460 U.S. at 591-92, 75 L. Ed. 2d at 308-09, 103 S. Ct. at 1375). Thus, a small group of newspapers had been targeted. The Court struck the statute down, because the only state interest identified was in raising revenue. The Court explained that:

> "A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency." *Minneapolis Star & Tribune Co.*, 460 U.S. at 585, 75 L. Ed. 2d at 304, 103 S. Ct. at 1371.

*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 95 L. Ed. 2d 209, 107 S. Ct. 1722 (1987), involved a first amendment challenge to an Arkansas sales tax exemption from a generally applicable sales tax for newspapers and " 'religious, professional, trade, and sports journals and/or publications printed or published within this State.' " *Arkansas Writers' Project, Inc.*, 481 U.S. at 224, 95 L. Ed. 2d at 216, 107 S. Ct. at 1725, quoting Ark. Stat. Ann. §84-1904(j). The publisher of a general interest magazine that covered a wide variety of topics, including religion and sports, claimed that denying it the exemption that was allowed to other magazines violated its rights under the first and fourteenth amendments. The Court struck down the statute, explaining that "selective taxation of the press—either singling out the press as a whole or targeting individual members of the press—poses a particular danger of abuse by the State." *Arkansas Writers' Project, Inc.*, 481 U.S. at 228, 95 L. Ed. 2d at 219, 107 S. Ct. at 1727. The Court held

that the tax at issue impermissibly targeted a small group within the press. The Court found this tax scheme particularly problematic because a magazine's tax status depended entirely on its content. *Arkansas Writers' Project, Inc.*, 481 U.S. at 229, 95 L. Ed. 2d at 219-20, 107 S. Ct. at 1728. Because the Court invalidated the tax scheme on this basis, it did not reach the magazine's alternate claim that treating magazines and newspapers differently violated the first amendment. Justice Scalia and Chief Justice Rehnquist dissented, arguing that the subsidy scheme struck down here was no different from others that the Court had upheld. *Arkansas Writers' Project, Inc.*, 481 U.S. at 235-38, 95 L. Ed. 2d at 223-25, 107 S. Ct. at 1730-32 (Scalia, J., dissenting, joined by Rehnquist, C.J.).

In *Leathers v. Medlock*, 499 U.S. 439, 113 L. Ed. 2d 494, 111 S. Ct. 1438 (1991), a cable television subscriber and a trade organization of cable operators brought a first amendment challenge to Arkansas's sales tax on cable television services. Arkansas imposed a gross receipts tax on the sale of tangible personal property and specified services. However, the statute in question expressly exempted receipts from subscription and over-the-counter newspaper sales and subscription magazine sales. Cable television was not exempted. *Leathers*, 499 U.S. at 441-43, 113 L. Ed. 2d at 500-01, 111 S. Ct. at 1440-41.

The Court rejected the first amendment challenge, explaining that differential taxation of first amendment speakers is constitutionally suspect when it threatens to "suppress the expression of particular ideas or viewpoints." *Leathers*, 499 U.S. at 447, 113 L. Ed. 2d at 503, 111 S. Ct. at 1443. The Court explained that the government may not, without a compelling justification: (1) exercise its taxing power to single out the press; (2) target a small group of speakers; or (3) discriminate on

the basis of the content of taxpayer speech. *Leathers*, 499 U.S. at 447, 113 L. Ed. 2d at 503-04, 111 S. Ct. at 1443-44. The Court found none of those situations present. First, the tax was a tax of general applicability that did not single out the press. Second, a narrow group had not been selected to fully bear the burden of the tax. Third, the Court found that the Act was not content based; it simply applied to all cable television services. *Leathers*, 499 U.S. at 447-48, 113 L. Ed. 2d at 503-04, 111 S. Ct. at 1443. The Court explained that "differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." *Leathers*, 499 U.S. at 453, 113 L. Ed. 2d at 507-08, 111 S. Ct. at 1447. The Court found no problem with the Arkansas statute because the state legislature had

> "chosen simply to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas." *Leathers*, 499 U.S. at 453, 113 L. Ed. 2d at 508, 111 S. Ct. at 1447.

In *Speiser v. Randall*, 357 U.S. 513, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958), a group of honorably discharged World War II veterans were denied property tax exemptions for failing to sign a loyalty oath. The California constitution provided veterans with a property tax exemption. Beginning in 1954, the form to apply for the exemption contained a loyalty oath whereby the applicant would agree not to advocate the overthrow of the United States or California governments by force, violence or other unlawful means or to advocate the support of a foreign government against the United States. The oath was added pursuant to a statute that attempted to implement a constitutional amendment that provided that no

one who advocates the overthrow of the government can receive any tax exemption. The veterans argued that the statute denied them freedom of speech without the procedural safeguards required by the due process clause of the fourteenth amendment. *Speiser*, 357 U.S. at 514-17, 2 L. Ed. 2d at 1466-67, 78 S. Ct. at 1336-37.

The Court found that, although the state constitutional provision was valid, the method that the state had chosen to implement it was not, and that the veterans could not be required to execute the declaration as a condition for obtaining a tax exemption. The Court ultimately invalidated the statute on due process grounds, but, as part of its analysis, the Court explained:

"It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech. The Supreme Court of California recognized that these provisions were limitations on speech but concluded that 'by no standard can the infringement upon freedom of speech imposed by section 19 of article XX be deemed a substantial one.' 48 Cal. 2d 419, 440, 311 P.2d 508, 521. It is settled that speech can be effectively limited by the exercise of the taxing power. *Grosjean v. American Press Co.*, 297 U.S. 233. To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech. The appellees are plainly mistaken in their argument that, because a tax exemption is a 'privilege' or 'bounty,' its denial may not infringe speech. This contention did not prevail before the California courts, which recognized that conditions imposed upon the granting of privileges or gratuities must be 'reasonable.' It has been said that Congress may not by withdrawal of mailing privileges place limitations upon the freedom of speech which if directly attempted would be unconstitutional. *See Hannegan v. Esquire, Inc.*, 327 U.S. 146, 156; *cf. Milwaukee Publishing Co. v. Burleson*, 255 U.S. 407, 430-431 (Brandeis, J., dissenting). This Court has similarly rejected the contention that speech was not abridged when the sole restraint on its exercise was

withdrawal of the opportunity to invoke the facilities of the National Labor Relations Board, *American Communications Assn. v. Douds*, 339 U.S. 382, 402, or the opportunity for public employment, *Wieman v. Updegraff*, 344 U.S. 183. So here, the denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech. The denial is 'frankly aimed at the suppression of dangerous ideas.' *American Communications Assn. v. Douds, supra,* at 402." *Speiser*, 357 U.S. at 518-19, 2 L. Ed. 2d at 1468, 78 S. Ct. at 1338.

### The Small Venue Exemptions Do Not Violate the First Amendment

Before explaining why the small venue exemptions do not violate the first amendment, we must address two preliminary matters. First, despite *Regan*'s express statement that "[b]oth tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system" (*Regan*, 461 U.S. at 544, 76 L. Ed. 2d at 136, 103 S. Ct. at 2000), plaintiff takes issue with defendants' categorization of a tax exemption as being a form of subsidy, and relies on a footnote in *Regan* in which the Court explained that, "[i]n stating that exemptions and deductions, on the one hand, are like cash subsidies, on the other, we of course do not mean to assert that they are in all respects identical" (*Regan*, 461 U.S. at 544 n.5, 76 L. Ed. 2d at 136 n.5, 103 S. Ct. at 2000 n.5, citing *Walz v. Tax Comm'n of the City of New York*, 397 U.S. 664, 674-76, 25 L. Ed. 2d 697, 704-05, 90 S. Ct. 1409, 1414-15 (1970)). In addition, plaintiff cites *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 589-90, 137 L. Ed. 2d 852, 873-74, 117 S. Ct. 1590, 1605 (1997), in support of its claim that exemptions and subsidies differ in important respects. However, *Camps Newfound* was a commerce clause case, and *Walz* was an establishment clause case. *Regan*, like the present case, involved a claim under the free speech clause of the first

amendment. In this context, the Supreme Court quite clearly said that tax exemptions can be considered to be subsidies that are administered through the tax system. If there was any doubt about this, it was put to rest in *Davenport*, where the Court cited *Regan*—a tax-exemption case—for the proposition that it is "well established that the government can make content-based distinctions when it subsidizes speech." *Davenport*, 551 U.S. at 188-89, 168 L. Ed. 2d at 81, 127 S. Ct. at 2381. Thus, for our purposes, the fact that the Supreme Court has drawn distinctions between exemptions and subsidies in commerce clause and establishment clause cases is irrelevant, and the tax exemptions in defendants' ordinances may be analyzed as subsidies.

Second, we must address the scope of the definition of "adult entertainment cabaret" in the ordinances. Plaintiff has misperceived the scope of this definition, and a proper understanding of it is necessary before we may resolve the constitutionality of the ordinances. Plaintiff has continually argued that under the plain language of the ordinances, theaters showing plays such as "Hair," in which the actors appear naked, would be subject to being classified as "adult entertainment cabarets."[2] The County's zoning ordinance defines "adult entertainment cabaret" as, *inter alia*, a

> "public or private establishment which features topless dancers, strippers, male or female impersonators *or other entertainers* who:
>> A. Display or simulate the display of 'specified anatomical areas[.]' " Cook County Zoning Ordinance of 2001, art. 14.2.1 (2006).

According to plaintiff, an actor who appears naked or partially naked in a play is an "other entertainer" who displays specified anatomical areas, and thus applicabil-

---

[2]Plaintiff made this argument in relation to its overbreadth counts, but it is relevant to the issue before us.

ity of the small venue exemption can turn on whether there is any nudity or partial nudity in a production.

We disagree with plaintiff's interpretation because it violates the cardinal rule of statutory construction known as *ejusdem generis*. The rules of statutory construction apply to municipal ordinances. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Under the *ejusdem generis* doctrine, when a statutory clause specifically describes several classes of persons or things and then includes "other persons or things," the word "other" is interpreted to mean "other such like." *People v. Davis*, 199 Ill. 2d 130, 138 (2002). *Ejusdem generis* is a "common drafting technique designed to save the legislature from spelling out in advance every contingency in which the statute could apply." 2A N. Singer & J. Singer, Sutherland on Statutory Construction §47:17, at 370-73 (7th ed. 2007). The interpretation is justified on the ground that, if the general words were given their full and ordinary meaning, the specific words would be superfluous as encompassed by the general terms. If the legislature had meant the general words to have their unrestricted sense, it would not have used the specific words. 2A N. Singer & J. Singer, Sutherland on Statutory Construction §47:17 (7th ed. 2007). Applying this drafting technique makes perfect sense here because it allows the County to clearly set out the type of entertainment it is talking about, while not giving particular establishments easy ways around the definition: *e.g.*, "they are not strippers, they already have their clothes off"; "they are not topless, but bottomless"; *etc.* Thus, the phrase does not mean "any entertainer," but "entertainers like strippers, topless dancers, or male or female impersonators." Actors who appear naked or partially naked in fine arts productions would clearly not fall within the scope of the County's ordinance.

The City's ordinance is worded slightly differently. In

the City's adult use ordinance, the phrase "topless dancers, strippers, male or female impersonators" is followed by a semicolon, and the next clause is "not infrequently features entertainers who display specified anatomical areas." For several reasons, we construe the City's definition of "adult entertainment cabaret" as having the same meaning as the County's. First, the City was granted permission to intervene in this case based on its insistence that its amusement tax ordinance and small venue exemptions were identical to the County's and that any appellate court ruling on the validity of the County's ordinance would apply to its ordinance as well. Moreover, in moving to dismiss plaintiff's overbreadth count, the City argued that the plaintiff's interpretation of its ordinance as applying to nudity in theatrical productions was "erroneous as a matter of law." Second, in *Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000), the court held that an ordinance that defined an "adult cabaret" as, *inter alia*, a "commercial establishment which *regularly features*: (a) persons who appear in a state of nudity or semi-nude" (emphasis added) could be interpreted to mean that it must feature "nudity, semi-nudity or specified sexual content as the permanent focus of its business and [give] special prominence to such content on a permanent basis," and this would preclude application of the definition to theaters showing productions such as "Hair." *Schultz*, 228 F.3d at 849-50. We believe that this same interpretation can be given to an ordinance that uses the phrase "not infrequently features." Third, all provisions of a legislative enactment are viewed as a whole, and thus all words and phrases must be interpreted in light of other relevant provisions and must not be construed in isolation. *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007). When the definition of "adult entertainment cabaret" is read *in its entirety*, it is clear what type of entertainment the City is talking

about. Therefore, although the wording of the City's ordinance, unlike the County's, does not present the textbook case of *ejusdem generis*, the term "entertainer" in the City's ordinance should be construed the same as the term "other entertainer" in the County's ordinance. The amusement tax ordinances therefore draw a clear distinction between two entirely different types of entertainment.

With these understandings in place, we now turn to a consideration of the constitutionality of the small venue exemptions. We believe that the exemptions clearly fall within the scope of Supreme Court authority allowing the government to make content-based distinctions when it subsidizes speech, and plaintiff cannot plead any set of facts that would demonstrate otherwise.

The first thing that must be understood is that the amusement taxes are *generally applicable* taxes applying to a broad range of amusements, with some involving protected speech and some not. "When the State imposes a generally applicable tax, there is little cause for concern." *Minneapolis Star & Tribune*, 460 U.S. at 585, 75 L. Ed. 2d at 304, 103 S. Ct. at 1371. Plaintiff has cited a Texas trial court opinion and a Tennessee Attorney General opinion finding that taxes on patrons of strip clubs were unconstitutional. *Texas Entertainment Ass'n v. Combs*, No. D—1—GN07—004179 (345th Dist. March 28, 2008); Legality of Privilege Tax on Entry of Customers Into Adult-Oriented Establishments, Tenn. Op. Att'y Gen. 08—78 (April 2, 2008). But the problem with these taxes was that they were placed *only* on adult entertainment. In the Tennessee Attorney General opinion, the Attorney General explained that first amendment concerns were raised because the tax would apply only to patrons of adult-oriented establishments, but that the first amendment would not prohibit subjecting these patrons to generally applicable taxes. Legality of Privilege

Tax on Entry of Customers Into Adult-Oriented Establishments, Tenn. Op. Att'y Gen. 08—78 (April 2, 2008). Here, even when the small venue exemptions are taken into account, many amusements featuring protected first amendment activity are still taxed, including performances in venues holding more than 750 persons, movies, any paid television programming, promotional shows, and performances at adult entertainment cabarets. Thus, this situation does not present the danger warned against in *Finley* that government funding can result "in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.' " *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2179, quoting *Simon & Schuster, Inc.*, 502 U.S. at 116, 116 L. Ed. 2d at 487, 112 S. Ct. at 508.

Here, we are *not* dealing with a direct regulation of adult entertainment but rather a clearly identified government program—to foster the production of live performances that offer theatrical, musical or cultural enrichment to the people of Cook County and Chicago. Defendants have chosen to implement this program by exempting from the amusement tax performances that take place in venues that seat 750 persons or fewer and feature live performances in any of the disciplines that are commonly regarded as part of the fine arts. The question we must resolve is whether defendants have run afoul of the first amendment in doing so, and we keep the following principles in mind.

"There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher v. Roe*, 432 U.S. 464, 475, 53 L. Ed. 2d 484, 495, 97 S. Ct. 2376, 2383 (1977). In the subsidy context, funding may be allocated according to criteria that would not be permissible when direct regulation of speech is involved. *Finley*, 524 U.S. at 587-88, 141 L. Ed.

2d at 516, 118 S. Ct. at 2179. The Supreme Court has also explained that, "[w]ithin far broader limits than petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust*, 500 U.S. at 194, 114 L. Ed. 2d at 256, 111 S. Ct. at 1773. Moreover, the Supreme Court has stated that when government establishes subsidies for specified ends, certain restrictions may be necessary to define the program's limits (*Velazquez*, 531 U.S. at 543, 149 L. Ed. 2d at 73-74, 121 S. Ct. at 1050), and "it is well established that the government can make content-based distinctions when it subsidizes speech" (*Davenport*, 551 U.S. at 188-89, 168 L. Ed. 2d at 81, 127 S. Ct. at 2381). The legislature's decision not to subsidize the exercise of a fundamental right does not infringe that right and is not subject to strict scrutiny, and "[w]here governmental provision of subsidies is not ' "aimed at the suppression of dangerous ideas," ' *Cammarano*, 358 U.S. at 513, its 'power to encourage actions deemed to be in the public interest is *** far broader' *Maher*, *supra*, at 476." *Regan*, 461 U.S. at 550, 76 L. Ed. 2d at 139, 103 S. Ct. at 2003.

Here, all that has happened is that defendants have enacted a government program believed to be in the public interest—encouraging fine arts performances in small venues—and have defined the program in such a way that will achieve its ends. Defendants have chosen to accomplish this goal by subsidizing live fine arts performances in small venues, and they are entitled to define the parameters of that program in a way that will accomplish their goals. Because the goal is to encourage live fine arts performances in small venues, it is perfectly logical for defendants to exclude categories of protected speech that will not advance its goals, *e.g.*, movies, television, promotional shows, performances at adult entertainment cabarets, and performances in venues that seat more than 750 persons.

Moreover, the Supreme Court has drawn a clear distinction between engaging in content-based discrimination in *establishing* a program and engaging in viewpoint-based discrimination *within* the program. In *Rosenberger*, the Court explained that content discrimination is permissible if it preserves the purposes of the limited forum, but viewpoint-discrimination is presumed impermissible when directed against speech otherwise within the forum's limitation. *Rosenberger*, 515 U.S. at 829-30, 132 L. Ed. 2d at 715-16, 115 S. Ct. at 2519. In that case, the program that was established was to fund the printing costs of student publications. Once it had established this program, the University attempted to discriminate against those publications expressing religious viewpoints. The Court applied this same reasoning in *Velazquez*. In that case, the Court applied the limited-forum rationale to a subsidy case and explained that the government was not required to fund LSC attorneys to represent indigent clients, and, in establishing such a program, Congress could set reasonable limits on the range of legal representation and relationships. What it could not do was, once it had set up a program for representation of indigent clients in specified situations, place limits on the arguments that the lawyer was entitled to make on behalf of his client. *Velazquez*, 531 U.S. at 544, 149 L. Ed. 2d at 74, 121 S. Ct. at 1050.

Applying those same principles here, defendants were entitled to make reasonable content-based distinctions in creating a program to subsidize the fine arts, and, as stated above, they clearly have done so. What would be problematic, under the reasoning of the above cases, would be to engage in viewpoint-based discrimination within the parameters of the program. Thus, for example, it would likely raise first amendment concerns if defendants were to decide that the exemption would not be available for theaters featuring plays that express

disfavored viewpoints. The appellate court's statement that the government cannot encourage one private speaker over another based on content or message (378 Ill. App. 3d at 277) is simply not correct. While that is true when the government creates a limited public forum for diverse viewpoints (*Rosenberger*, 515 U.S. at 834-35, 132 L. Ed. 2d at 718-19, 115 S. Ct. at 2519), it is not true as a general principle. Clearly, the government can make content-based distinctions in enacting a program believed to be in the public interest, and that is all that has happened here. A more appropriate label for the difference between adult entertainment cabarets and small fine arts venues might be "format" or "activity" rather than content, but even if the difference is one of "content," the Supreme Court has quite clearly stated that "it is well established that the government can make content-based distinctions when it subsidizes speech." *Davenport*, 551 U.S. at 188-89, 168 L. Ed. 2d at 81, 127 S. Ct. at 2381. If one of those permissible distinctions is not a distinction between fine arts venues and strip clubs, it is difficult to imagine what would be.

Defendants' program does *not* discriminate on the basis of viewpoint. Indeed, the program established here is even less problematic than the one considered in *Finley*. In *Finley*, the statute required a consideration of decency and respect standards in awarding grants. Here, defendants have chosen to subsidize *all* productions at small fine arts venues, and no minimum standards have to be met and no considerations of viewpoint are taken into account. The Supreme Court has stated that subsidies may indirectly abridge speech, but only if the funding scheme is " 'manipulated' to have a 'coercive effect' " on those who do not hold the subsidized position or when the government's power is leveraged into "a penalty on disfavored viewpoints." *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2178. Clearly,

that has not happened here, and defendants have likewise not aimed at the suppression of dangerous ideas. See *Finley*, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct. at 2178. Venues that fall within the government's program can present any ideas they wish, and no idea or viewpoint is suppressed.

Plaintiff erroneously sees itself as within the program set up by defendants, but then discriminated against because of the content of its performances. In its complaint, plaintiff pleaded that its entertainment is encompassed by either "modern or traditional dance" or "other live cultural performances." These are simply conclusions, however, and plaintiff cannot plead specific facts placing its activities within these terms. First, the ordinances do not simply use the term "modern or traditional dance." Rather, they apply to "a live performance in any of the disciplines *which are commonly regarded as part of the fine arts*, such as live theater, music, opera, drama, comedy, ballet, *modern or traditional dance*, and book or poetry readings." (Emphasis added.) Cook County Amusement Tax Ordinance §2 (1999); Chicago Municipal Code §4—156—010 (2008). The terms "modern or traditional dance" must be read in light of the opening phrase "commonly regarded as part of the fine arts." Thus, the ordinances apply only to the types of modern or traditional dance that are commonly regarded as part of the fine arts. Second, the word "cultural" means "of or relating to the artistic and intellectual aspects or content of human activity." Webster's Third New International Dictionary 552 (1993).

Plaintiff simply cannot plead facts that would place the activities that take place at adult entertainment cabarets within these definitions. Rather, the types of activities that take place at "adult entertainment cabarets" have been described by the Supreme Court as falling only within the outer ambit of the first amend-

ment's protection (*City of Erie*, 529 U.S. at 289, 146 L. Ed. 2d at 278, 120 S. Ct. at 1391) or only marginally within the outer perimeters of the first amendment (*Barnes*, 501 U.S. at 565-66, 115 L. Ed. 2d at 511, 111 S. Ct. at 2460). These definitions obviously have never been applied to the fine arts. Further, the negative secondary effects of adult entertainment cabarets have been well documented (see *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 412-13 (2006)), and an entire body of case law deals with the standards to be employed when communities regulate the negative secondary effects of adult entertainment establishments (see, *e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 152 L. Ed. 2d 670, 122 S. Ct. 1728 (2002); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003)). We are not aware of any cases dealing with negative secondary effects of fine arts venues. There is no possibility that plaintiff can plead sufficient facts to establish that it is being discriminated against within defendants' program solely because of the content of its performances. Plaintiff is simply present-ing an entirely different type of activity than what defendants are subsidizing. Defendants just as reason-ably excluded adult entertainment cabarets as they did movie theaters, and they are not suppressing the first amendment activity of either. Plaintiff simply cannot plead sufficient facts to demonstrate a substantial risk that application of the small venue exemptions will lead to the suppression of speech. See *Finley*, 524 U.S. at 580, 141 L. Ed. 2d at 511, 118 S. Ct. at 2175.

What we have said so far clearly demonstrates why *Rosenberger* and *Velazquez* are distinguishable, and we will now address the other primary cases relied upon by plaintiff. *Minneapolis Star & Tribune Co.* and *Arkansas Writers' Project* both involved the press. In *Minneapolis*

*Star & Tribune Co.*, the Court held that it violates the first amendment for a tax statute to single out the press for special treatment or to target a small group within the press. Neither situation is present here. In *Arkansas Writers' Project*, the state taxed magazines differently based on their content. Whether or not a particular magazine paid the tax depended entirely on the magazine's content. In invalidating the statute, the Court once again reiterated the "particular danger of abuse" that is posed when individual members of the press are targeted. *Arkansas Writers' Project, Inc.*, 481 U.S. at 228, 95 L. Ed. 2d at 219, 107 S. Ct. at 1727. Notably, however, the Court did not reach the argument of whether it was permissible to tax magazines and newspapers differently. Later, in *Leathers*, the Court held that it was permissible to exempt newspaper and magazine sales from a generally applicable tax but to deny the exemption to cable television subscribers. As we explained above, the amusement tax ordinances do not discriminate based on the content of performances at small fine arts venues. If that were the case, this would be more like the situation that the Court found problematic in *Arkansas Writers' Project*. For the reasons set forth above, however, adult entertainment cabarets are not presenting works that are a subset of defendants' program. They are presenting an entirely different type of entertainment. Thus, denying adult entertainment cabarets an exemption reserved for small fine arts venues is as reasonable as denying cable television subscribers an exemption reserved for purchasers of magazines and newspapers. Neither situation offends the first amendment.

Finally, this case is nothing like *Speiser*. That case involved a property-tax exemption for veterans. The government later conditioned the availability of that exemption on an applicant's swearing an oath that he would not engage in a particular type of political speech.

The Court stated that denying the tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from that speech, and that the denial of the exemption was aimed at the suppression of dangerous ideas. *Speiser* is entirely distinguishable. In that case, the veterans who were denied the exemption were otherwise qualified for it. The tax exemption in question was a property tax exemption for veterans, and the veterans in question were denied it because they refused to sign an oath stating that they would not engage in a particular type of speech. Here, as set forth above, plaintiff never was within the scope of the exemption established by defendants. Plaintiff is not being denied an exemption for engaging in speech. Rather, plaintiff is denied the exemption because it is not a small fine arts venue. Similarly, movie theaters are denied the exemption not because of the expressive content of their performances, but because they are not small fine arts venues. Defendants are not aiming at the suppression of dangerous ideas, and plaintiff cannot seriously argue that denying it this exemption will have the effect of coercing it to refrain from any speech. Plaintiff's patrons are subject to the same generally applicable amusement taxes as they were before the small venue exemptions were enacted.

What we have said above settles the first amendment issue. Plaintiff's complaint also alleged that the small venue exemption violated the "freedom of speech" provision of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §4). In *People v. DiGuida*, 152 Ill. 2d 104, 121-22 (1992), this court recognized that the framers contemplated that this clause could, in certain circumstances, provide greater protection to free speech than does its federal counterpart. In its brief, however, plaintiff focuses on first amendment cases and provides no argument as to why we should interpret the free speech clause as providing greater protection here. In *Pooh Bah I*, this

court noted that the majority view of state courts is that their state constitutions provide no greater protection than the first amendment when nude or seminude dancing is involved, and this court found the majority view persuasive. *Pooh Bah I*, 224 Ill. 2d at 447. Consequently, we conclude that plaintiff's claim under the free speech clause of the Illinois Constitution did not state a claim upon which relief could be granted.

Because the appellate court went beyond the question presented to it—whether the complaint stated a cause of action—and decided the first amendment issue on the merits, it did not reach plaintiff's other claims. Plaintiff and defendants disagree over the status of those claims. Plaintiff claims that they are not "ripe" for this court's consideration because the appellate court did not reach them. Defendants claim that plaintiff has waived these arguments by not presenting them in this court. Plaintiff, however, is the appellee in this court. The only issue decided by the appellate court was the first amendment one, and defendants brought that issue to this court for review. The appropriate course in this situation is to remand to the appellate court for consideration of those issues that it did not reach, and the appellate court should be cognizant of the rulings in this opinion and proceed accordingly. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 162 (1999).

## CONCLUSION

Plaintiff's first amendment and free speech clause claims failed to state claims upon which relief could be granted. The circuit court correctly dismissed these claims, and the appellate court erred in reversing the circuit court. We reverse the appellate court's judgment and remand the cause to the appellate court for consideration of plaintiff's remaining claims.

*Appellate court judgment reversed;*
*circuit court judgment affirmed in part;*
*cause remanded.*