# Illinois Official Reports

## Appellate Court

---

### *Hall v. Cipolla*, 2018 IL App (4th) 170664

---

| | |
|---|---|
| Appellate Court Caption | JODI L. HALL, Independent Administrator of the Estate of Jason A. Hall, Deceased, Plaintiff-Appellant, v. ROBERTO P. CIPOLLA and OSF HEALTHCARE SYSTEM, d/b/a St. Joseph PromptCare, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-17-0664 |
| Filed | October 16, 2018 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 15-L-134; the Hon. Rebecca S. Foley, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Laird M. Ozmon, of Joliet, and James P. Ginzkey, of, Bloomington, for appellant.<br><br>Hinshaw & Culbertson LLP, of Chicago (Joshua G. Vincent, Jesse A. Placher, and Carson R. Griffis, of counsel), for appellees. |

Panel      JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Steigmann and DeArmond concurred in the judgment and opinion.

# OPINION

¶ 1  Plaintiff is Jodi Hall, independent administrator of the estate of Jason A. Hall (Hall), who is deceased. Defendants are an urgent-care physician, Roberto P. Cipolla, and his employer, OSF Healthcare System (OSF), doing business in Bloomington, Illinois, as St. Joseph PromptCare (PromptCare). Plaintiff brought this action against defendants for medical malpractice. In February 2017, the jury returned a verdict in defendants' favor. Plaintiff appeals, arguing that the McLean County circuit court erred by failing to direct a verdict in her favor and by denying her motion for judgment notwithstanding the verdict and her alternative motion for a new trial.

¶ 2  Specifically, plaintiff makes the following nine arguments.

¶ 3  First, plaintiff argues that the trial court should have directed a verdict in her favor. But plaintiff never moved for a directed verdict, and (setting aside the question of whether she would have been entitled to a directed verdict) we are aware of no statute or case laying an obligation on trial courts to direct verdicts on their own initiative.

¶ 4  Second, plaintiff argues that because Cipolla judicially admitted, in plaintiff's case-in-chief, that he breached the standard of care in his treatment of Hall, plaintiff was entitled to a directed verdict or at least a judgment notwithstanding the verdict. We hold that plaintiff forfeited her theory of judicial admissions by participating, without objection, in a full trial on the issue of whether Cipolla breached the standard of care. It was not until posttrial proceedings that plaintiff raised the theory that judicial admissions by Cipolla had eliminated that issue—after the parties had spent several days trying that issue and the jury had returned a verdict. Even if such affirmative acquiescence by plaintiff did not work a forfeiture, all of the admissions by Cipolla that she identifies in her brief are decontextualized evidentiary admissions, not judicial admissions.

¶ 5  Third, plaintiff argues that the verdict in defendants' favor is against the manifest weight of the evidence and that the trial court, therefore, erred by denying her motion for a new trial. We disagree that the evidence clearly and indisputably weighs in plaintiff's favor.

¶ 6  Fourth, plaintiff argues she should receive a new trial because the trial court refused to admit in evidence a chest pain protocol that OSF had drafted for use in its emergency department. Because the chest pain protocol discussed only emergency-department procedures and Cipolla committed the alleged malpractice in PromptCare instead of in the emergency department, we find no abuse of discretion in the court's ruling that the chest pain protocol was, by its own terms, irrelevant to this case.

¶ 7  Fifth, plaintiff argues she should receive a new trial because defendants had forfeited the affirmative defense of comparative negligence by failing to plead it and, thus, the trial court erred by denying her motion *in limine* to bar testimony that Cipolla had instructed Hall to follow up with his primary-care physician (something Hall never did). We hold that because

plaintiff never made a contemporaneous objection to such testimony in the trial itself, this issue is forfeited.

¶ 8 Sixth, plaintiff argues she should receive a new trial because the trial court denied her motion to bar defendants from calling Janet Guth as a witness. Plaintiff represents to us that defendants disclosed Guth only one day before trial. On the contrary, it appears from the record that defendants disclosed her sooner than that. Defendants disclosed her before the court-imposed deadline by notifying plaintiff she reserved the right to call anyone whom plaintiff listed, in the past or future, as a witness (including Guth). Because the two discovery depositions that plaintiff took of Guth are not in the record, we are unable to tell if her testimony at trial was unfairly surprising to plaintiff. Any ambiguity arising from the incompleteness of the record should be resolved against plaintiff, the appellant.

¶ 9 Seventh, plaintiff argues she should receive a new trial because the trial court unjustifiably prevented her from impeaching Guth with her deposition testimony. Again, because the transcripts of Guth's depositions are not in the record, we lack the means to address this issue.

¶ 10 Eighth, plaintiff argues she should receive a new trial because the trial court refused her proposed jury instruction on the similar-locality rule. Because PromptCare is not a disadvantaged medical facility in a small, rural community, the similar-locality rule is inapplicable, and the court was correct to refuse plaintiff's proposed instruction on that rule.

¶ 11 Ninth, plaintiff argues she should receive a new trial because the trial court rejected her challenge for cause against two prospective jurors, Brandy Redman and Jacklyn Morris. Because plaintiff removed Redman by a peremptory challenge, it is unclear how plaintiff was prejudiced by the court's preceding refusal to remove Redman for cause. As for Morris, plaintiff explicitly accepted her as a juror even though she could have peremptorily challenged her, too. So, plaintiff has waived any contention of error in the court's preceding refusal to remove Morris for cause.

¶ 12 Finding no merit in any of those arguments, we affirm the judgment.

I. BACKGROUND

A. The Basic Facts

¶ 15 On November 10, 2010, Hall, who was 34, came to PromptCare for medical treatment. The employee at the front desk, Dawn Shay, asked him the reason for his visit. She typed: "[L]eft upper chest pain, was moving a lot [*sic*] of metal today, 'cramping in neck and arms sometimes.' "

¶ 16 After examining Hall and administering an electrocardiograph, Cipolla diagnosed chest wall pain—specifically, muscle strain in the chest. He prescribed aspirin and Darvocet and told Hall to follow up with his primary-care physician.

¶ 17 Hall died of a heart attack a little more than three weeks later, on December 6, 2010.

¶ 18 Plaintiff brought this action against defendants, alleging that Cipolla had breached the standard of care by failing to (1) refer Hall to the emergency department, (2) obtain important medical information from him and enter it in his medical records, and (3) tell him that his electrocardiogram was abnormal.

## B. Two Challenges for Cause by Plaintiff

¶ 20    During jury selection, two prospective jurors, Jacklyn Morris and Brandy Redman, divulged that they had received medical treatment at PromptCare. Morris said she had been to PromptCare about four times—the last time being several months ago—and she thought, but could not be sure, that Cipolla was the physician who had treated her; at least, he looked familiar. He was not, however, her primary-care physician, and she denied that anything about her visits to PromptCare would impair her fairness or impartiality. Nor was she concerned that her decision as a juror would have any effect on how Cipolla would treat her in the future, should she return to PromptCare. She would have no reservations about seeing him again as his patient.

¶ 21    Redman said that Cipolla had treated her at PromptCare but that it had been at least a couple of years ago. She denied that her past consultation with him, or potential future consultation with him, as his patient would have any effect on her decision in this case. She would have no qualms about receiving medical treatment from him again in the future.

¶ 22    Despite such assurances, plaintiff challenged Morris and Redman for cause, arguing that their visits to Cipolla, in PromptCare, should disqualify them from serving on the jury. The trial court rejected these challenges, noting that (1) plaintiff had not challenged a third prospective juror who had visited PromptCare, (2) none of the prospective jurors currently were undergoing treatment at PromptCare, and (3) it was a matter of speculation whether Morris or Redman ever would return to PromptCare.

¶ 23    After the trial court refused plaintiff's peremptory challenge of Morris and Redman, plaintiff accepted Morris and used her first peremptory challenge to remove Redman. The trial transcript of January 30, 2017, reads as follows:

> "THE COURT: Cruzan, Gerwick, Morris, Nobilung.
>
> MR. GINZKEY [(PLAINTIFF'S ATTORNEY)]: I accept.
>
> THE COURT: Mr. Estes [(defendants' attorney)]?
>
> MR. ESTES: Excuse Mr. Cruzan.
>
> THE COURT: That gives you Brandy Redman [to replace Cruzan as a prospective juror].
>
> MR. ESTES: I accept.
>
> MR. GINZKEY: Excuse Brandy Redman.
>
> THE COURT: You've used two peremptories apiece."

## C. Two Motions *in Limine* by Plaintiff

### 1. *Motion to Exclude Cipolla's Discharge Instruction That Hall Follow Up With His Primary-Care Physician*

¶ 26    Before trial, plaintiff filed a motion *in limine* to bar defendants from presenting evidence that Cipolla had instructed Hall to follow up with his primary-care physician, arguing that such evidence would be relevant only to comparative negligence, an affirmative defense that defendants had forfeited by omitting to plead it.

¶ 27    Defendants' attorney responded he had no intention to argue that Hall had been comparatively negligent. He said he intended only to show that Cipolla had done everything he was supposed to do as a conscientious urgent-care physician; one of the things he was

supposed to do was tell Hall to follow up with his primary-care physician. The trial court denied the motion *in limine* but forbade defendants to argue comparative negligence.

¶ 28                                    2. *Motion to Bar Janet Guth From Testifying*

¶ 29        Janet Guth was the information technology manager at PromptCare. Plaintiff moved to bar her from testifying in defendants' case-in-chief, claiming that defendants had failed to make a timely disclosure of her as a witness.

¶ 30        Defendants responded that, in disclosing their witnesses, they had explicitly reserved the right to call any witness that plaintiff had identified in the past or would identify in the future and that plaintiff, in her witness list, had identified Guth. Also, defendants noted, plaintiff had deposed Guth twice so there would be no surprise. Defendants promised the trial court that Guth would testify only to matters covered in her depositions. The court denied plaintiff's motion on condition that Guth's testimony at trial did not go beyond her testimony in her two depositions.

¶ 31                 D. Defendants' Motion *in Limine* to Exclude the Chest Pain Protocol

¶ 32        On the ground of irrelevancy, defendants moved to bar plaintiff from offering as evidence a chest pain protocol, because, by its terms, the chest pain protocol applied to OSF's emergency department instead of to PromptCare. The document stated that "[p]atients presenting to the [emergency department] with complaints of chest pain have the [c]hest [p]ain [c]are [p]rofile initiated." Apparently, the chest pain care profile no longer exists, or it is lost—defendants told plaintiff they could not find it—but the chest pain protocol (which references the chest pain care profile) still exists, and it prescribes procedures for personnel in the emergency department when they treat patients who have chest pain. Because Hall was treated in PromptCare instead of in the emergency department, defendants argued that the chest pain protocol lacked probative value.

¶ 33        The trial court agreed. In granting defendants' motion *in limine*, the court reasoned:

> "[T]his document, the chest pain protocol[,] says ['p]atients presenting to the [emergency department] at OSF.['] Mr. Hall did not present to the [emergency department]. He presented to PromptCare. I have no information that[,] as a PromptCare physician[,] Dr. Cipolla even knows this exists. Even if he does know it exists[,] it applies to the emergency department[,] and this case did not arise out of the emergency department."

¶ 34                 E. The Scope of Services That PromptCare Was Designed to Offer

¶ 35        Plaintiff's exhibit No. 22 is a printout from the website of OSF St. Joseph Medical Center, which, the parties seem to agree, is the same as OSF. The printout states that PromptCare is "designed to efficiently treat sudden minor illnesses and injuries" and that, "[f]or more severe problems such as chest pain, shortness of breath, abdominal pain, or stroke symptoms, you should seek treatment in the OSF St. Joseph Medical Center Emergency Department, which is open 24 hours a day."

¶ 36        Thus, judging by plaintiff's exhibit No. 22, chest pain should go straight to the emergency department. On the other hand, though, in plaintiff's exhibit No. 7, OSF made it a policy that

PromptCare would treat *some* chest pain. This exhibit is entitled "Scope of Service," and it reads as follows:

"Scope of services provided by PromptCare are:

* * *

Chest Pain—non-cardiac, age<30, no cardiac history or respiratory distress

* * *

PromptCare is not designed to provide care for life[-]threatening injuries and illnesses such as:

* * *

Chest pain—suspected to be of cardiac origin[.]"

¶ 37                    F. Scott Denton's Findings in the Autopsy

¶ 38    A forensic pathologist, Scott Denton, performed on autopsy on Hall. He found significant blockage in the arteries of the heart, and he observed that the heart was enlarged—typically a sign of hypertension. Such severe heart disease was "very unusual" in a 34-year-old, and it would have taken years to develop. Although Denton could not say to a reasonable degree of scientific certainty that Hall was having a heart attack on November 10, 2010, when he visited PromptCare, Denton could say that the condition of Hall's cardiovascular system and some of the recently healed cardiac scarring were "consistent with [his] having a cardiac event or heart attack at the time of his PromptCare visit."

¶ 39                         G. Cipolla's Testimony
¶ 40                            1. *His Employment*
¶ 41    Cipolla was an urgent-care physician, and he practiced in PromptCare, which was located in the hospital building, Eastland Medical Plaza.

¶ 42                        2. *His Board Certifications*
¶ 43    In 2006, Cipolla earned a board certification in urgent care. Before he specialized in urgent care, his specialty was family practice, in which he also was board certified.

¶ 44    To earn both board certifications, he had to demonstrate competence in interpreting electrocardiograms and completing a workup, or complete evaluation, of patients for potential cardiac conditions.

¶ 45            3. *His Admitted Obligation to Stay Within the Scope of Services,*
            *Under Which Some Chest Pain Was Treatable in PromptCare*
                        *But Other Chest Pain Was Not*

¶ 46    PromptCare had a written scope of services (plaintiff's exhibit No. 7), which Cipolla admitted he was obligated to follow. He admitted that "[c]hest pain *** suspected to be of cardiac origin" was beyond the scope of services. He admitted he lacked the discretion to make any exceptions to what was and was not within the scope of services.

¶ 47    Cipolla admitted that, under the scope of services, it would be against PromptCare's policy for him to make a diagnosis of a coronary event. If there was a suspicion that the chest pain was

- 6 -

cardiac in origin, the scope of services required him to refer the patient to the emergency department and let the staff there make a diagnosis.

By the same token, however, Cipolla observed that "non-cardiac" "[c]hest pain" with "no cardiac history or respiratory distress" was explicitly within the scope of services (although the patient was supposed to be under the age of 30). And, paradoxically, it was a matter of diagnosis whether chest pain unaccompanied by a cardiac history or respiratory distress was, in fact, "non-cardiac." To "diagnose" means to "identify the nature of (an illness or other problem) by examination of the symptoms." The New Oxford American Dictionary (2d ed. 2005). To treat "non-cardiac" chest pain, it was necessary to make a negative diagnosis, *i.e.*, that the nature of the problem was not cardiac but, instead, was something else (*e.g.*, a muscle strain or a bruise). In fact, PromptCare was equipped with an electrocardiograph for that purpose, and Cipolla, as an urgent-care physician, was trained to interpret electrocardiograms.

This seeming paradox—no cardiac diagnosis permitted and, yet, an expectation to treat "non-cardiac" chest pain, so diagnosed—kept coming up in Cipolla's testimony. For instance, plaintiff's attorney asked the following:

"Q. Well, Doctor, I think we went through, you were not supposed to be diagnosing anything. You were supposed to be looking for suspicions, correct?

A. Yes, but I'm supposed to read and sign the electrocardiogram."

In response to an observation by plaintiff's attorney that Cipolla "said absolutely nothing to [Hall] whatsoever about any cardiac suspicion," even though the computer in the electrocardiograph interpreted the electrocardiogram as abnormal, Cipolla explained:

"A. My overall record reflects the evidence that the [electrocardiogram] was not supporting a diagnosis of acute ischemia, he had reproducible chest pain, he doesn't have hypertension, doesn't have diabetes, doesn't have [a] cholesterol problem. Yeah, a little smok[ing], a little overweight, young. So[,] the probability of a cardiac event is extremely small. So[,] I concluded this was chest wall pain.

Q. I understand, but you said right away that caught my ear[,] and it said diagnosis. Diagnosis, that you couldn't come to the diagnosis. You're not supposed to be diagnosing anything, right?

A. No, you are supposed to. I mean, if you don't think it's cardiac, I'm supposed to diagnose it.

Q. Well, we can go back to what we started with, and it comes out of your dep[osition], that the protocol doesn't envision or allow you to make any diagnosis. It only tells you to look for suspicions, true?

A. Regarding what?

Q. Regarding chest pain and cardiac origin?

A. Yeah, but I can rule it out."

## 4. *The Electrocardiogram*

The computer in an electrocardiograph generates an interpretation of the electrocardiogram, and the computer interpreted Hall's electrocardiogram as abnormal. Cipolla testified, however, that because computer interpretations of electrocardiograms were inaccurate most of the time, it was necessary for a physician to interpret the electrocardiogram. Although Cipolla saw some T-wave inversions in Hall's electrocardiogram, T-wave inversions

were only one factor in the determination of whether the electrocardiogram showed a cardiac disorder. In Cipolla's view, Hall's electrocardiogram as a whole raised no suspicion. At the time, he saw no need to inform Hall of the computer's interpretation, and he did not do so.

¶ 53          5. *The Dispute Over Whether the Medical Records Confirmed*
                  *That Cipolla Asked Hall About His Family History*

¶ 54          Cipolla insisted that, pursuant to his longstanding custom and practice, he asked Hall if there was any history of premature coronary artery disease in his family, and Hall answered "no." (It later emerged that both of Hall's parents had developed cardiac disease—in their sixties, though, so it was not premature.) At trial, there was a controversy as to whether the medical records confirmed that Cipolla had asked Hall that question.

¶ 55          The medical records were all on computer. In OSF's database, there was a comprehensive chart for Hall, which consisted of entries all the medical personnel had made who had previously seen Hall. On November 10, 2010, when examining Hall, Cipolla pulled up this comprehensive chart, which said "none" for family history. He testified that if, instead of answering "no," Hall had answered "yes" to his question of whether anyone in Hall's family had premature heart disease, Cipolla would have changed that preexisting entry. The comprehensive chart was different from the medical chart, which Cipolla actively filled in during his examination of Hall, using a computer mouse.

¶ 56          6. *Cipolla's Stated Reasons for Not Sending Hall to the Emergency Department*

¶ 57          From our review of his testimony at trial, we understand Cipolla as giving 12 reasons for not sending Hall to the emergency department—which is to say, for finding no suspicion that Hall's chest pain was cardiac in origin.

¶ 58          First, Hall said he only sometimes had cramping in his neck and arm, not that his neck and arm were hurting at the time of the examination. And he denied that his neck and arm hurt at the same time his chest hurt.

¶ 59          Second, he had never been diagnosed with hypertension, diabetes, or cardiac disease, and, at the time of the examination, his blood pressure and heart rate were only mildly elevated, as if by the pain.

¶ 60          Third, he was only 34 years old, and coronary artery disease was extremely rare in people under the age of 50.

¶ 61          Fourth, he denied any family history of premature coronary artery disease.

¶ 62          Fifth, he was only mildly obese, at 6 feet tall and 230 pounds.

¶ 63          Sixth, he had no respiratory distress and was not anxious and sweating. It was a totally different clinical presentation from someone having a heart attack.

¶ 64          Seventh, his chest pain was in the upper left chest instead of mid-sternum.

¶ 65          Eighth, the chest pain, as Hall described it, was not an angina-like crushing pain.

¶ 66          Ninth, his chest pain was reproducible on palpation, unlike cardiac chest pain, which was visceral rather than somatic.

¶ 67          Tenth, he was physically very active.

¶ 68          Eleventh, his chest pain had persisted over several hours, whereas ischemic chest pain typically came and went, increasing with activity and subsiding with rest.

¶ 69	Twelfth, the electrocardiogram, as Cipolla interpreted it, was not suspicious for ischemia or a myocardial infarction. He saw no significant changes in the leads—and he had been performing a workup of patients for cardiac events and interpreting their electrocardiograms for 30 years.

¶ 70	Cipolla testified that chest pain was seen in PromptCare four or five times a day, in patients over and under the age of 30, and that it would be a violation of the standard of care to automatically send them all to the emergency department. The standard of care required the urgent-care physician to judge whether the chest pain was suspicious for ischemia. To make that judgment, the physician had to look at the entire picture, not just one part of the electrocardiogram. "You have to conduct an analysis" to arrive at either suspicion or a lack of suspicion. "[Y]ou have to make a medical judgment and analysis in every case[:] is there enough data to make a reasonably careful physician suspicious or not ***?"

¶ 71	H. The Competing Opinions of the Retained Expert Witnesses

¶ 72	1. *Plaintiff's Retained Expert Witnesses*

¶ 73	Plaintiff called two physicians: Fred Jacobs, an expert in emergency medicine and urgent care from the University of Chicago, and Calum MacRae, an expert in cardiovascular disease from Harvard Medical School. In addition, plaintiff presented the evidence deposition of George Schroeder, an expert in urgent-care medicine. All three opined that because Hall reported chest pain and occasional pain in his neck and arm, both of his parents had been diagnosed with coronary artery disease in their later years, and the electrocardiogram was abnormal, the standard of care required Cipolla to transfer Hall to the emergency department, and Cipolla violated the standard of care by failing to do so. They also criticized Cipolla's documentation in that he had failed to enter in the medical records all the factors that had gone into his determination of no cardiac suspicion. MacRae agreed that the PromptCare scope of services prohibited Cipolla from making any diagnosis whatsoever, even if Cipolla believed there was no suspicion that Hall's chest pain was cardiac in origin. MacRae admitted, however, that, under the scope of services, not every patient over 30 years old who reported chest pain should be transferred to the emergency department.

¶ 74	2. *Defendants' Retained Expert Witnesses*

¶ 75	Defendants called James Walter, a physician who was board certified in emergency medicine, internal medicine, and critical care medicine, and Joseph Craft, a board-certified cardiologist who practiced in St. Louis, Missouri. They both opined that Cipolla had met the standard of care by finding no suspicion of a heart attack. They thought his documentation was customary and reasonable for urgent-care practice. And, in their view, nothing about Hall's clinical presentation, medical history, physical examination, and electrocardiogram would have made a reasonably careful physician suspect that his chest pain was cardiac in origin. They agreed with Cipolla's interpretation of the electrocardiogram, and both of them testified that physicians were more accurate at interpreting electrocardiograms than the electrocardiograph was. Craft explained that because 80% to 90% of electrocardiograms came out of the machine as abnormal, it was a practical necessity for physicians to interpret electrocardiograms. They did not think Cipolla had done anything wrong by omitting to tell Hall that the computer had interpreted his electrocardiogram as abnormal. Physicians had to share only important information with the patient, and a physician's interpretation of the

electrocardiogram was more important than the computer's interpretation. Both Walter and Craft commented on the rarity of Hall's advanced coronary disease for someone his age. In Craft's opinion, the fact that both of Hall's parents developed coronary disease in their sixties was of little use in determining whether Hall had coronary disease in this thirties. Walter testified that, in his 35 years of practice, he had "never seen a patient like this in 9000 patients." Craft similarly characterized Hall's coronary artery disease as "extraordinary" for a young man in his thirties.

¶ 76                          I. Plaintiff's Attempted Impeachment of Guth

¶ 77        Guth testified regarding PromptCare's "Epic" medical-records software. She explained that audit trails in the software enabled her to find out when a user had viewed a patient's medical chart. The audit trail for Hall's chart showed that Cipolla opened the chart at 6:21 p.m. on November 10, 2010; reviewed the allergy section, medication section, chief-complaint section, vitals section, flow sheets, and history section; and closed the chart at 7:04 p.m.

¶ 78        In the history section was the patient's family history. Guth testified that Hall's chart read " 'none' " for family history but that it was impossible for her to determine who had made that entry—whether Cipolla or someone else. She explained that, even though " 'none' " was the default setting, a physician could select " '[n]one' " as an option.

¶ 79        When plaintiff's attorney attempted to use one of Guth's depositions to cross-examine her on this latter point (that a physician could select " '[n]one' " as an option), defendants' attorney objected on the ground that the deposition testimony was not impeaching. In a sidebar conference, the trial court reviewed the relevant excerpt from the deposition and ruled: "I don't think this is proper impeachment based on the—in its entirety, so I'll sustain the objection."

¶ 80                       J. The Trial Court's Refusal of Plaintiff's Proposed
                              Jury Instruction on the Similar-Locality Rule

¶ 81        Plaintiff's attorney tendered a form of Illinois Pattern Jury Instructions, Civil, No. 105.01 (approved Dec. 2011) (hereinafter IPI Civil No. 105.01) that described the standard of care as "the knowledge, skill, and care ordinarily used by a reasonably careful urgent care physician *practicing in the same locality*." (Emphasis added.) His argument for this proposed instruction was that the PromptCare scope of services and the OSF website "set forth a very detailed standard of care specific to OSF PromptCare [u]rgent[-][c]are physicians and specific to patients with chest pain."

¶ 82        Defendants' attorney objected to the proposed instruction because (1) the notes to IPI Civil No. 105.01 said the similar-locality rule had "largely faded from practice" and (2) there was no difference between the PromptCare scope of services and the national standard of care applicable to urgent-care physicians.

¶ 83        For the following reason, the trial court refused plaintiff's proposed instruction on the similar-locality rule:

            "I don't think it adds anything with respect to the standard of care beyond what all of
            the experts have already testified to. And that is, the applicable standard of care for an
            urgent care specialist is to immediately refer a patient to the emergency department if
            there is a suspicion of chest pain that is cardiac in origin. What 'suspicion' means, I

think, is a question of fact for the jury to decide."

¶ 84                                    II. ANALYSIS
¶ 85              A. Not Directing a Verdict, *Sua Sponte*, in Plaintiff's Favor
¶ 86        In her brief, plaintiff argues that "the trial court should have directed a verdict without submitting the case to the jury." This argument is puzzling, considering that plaintiff never moved for a directed verdict.

¶ 87        In a posttrial memorandum to the trial court, plaintiff argued: "[I]t was the duty of the court to direct a verdict without submitting the case to the jury, even though no motion for directed verdict was made." In support of that argument, plaintiff cited section 2-1202 of the Code of Civil Procedure (735 ILCS 5/2-1202 (West 2016))—which, actually, says nothing about directing verdicts *sua sponte*. Rather, section 2-1202(a) provides: "*If at the close of the evidence, and before the case is submitted to the jury, any party moves for a directed verdict* the court may *** grant the motion ***.*" (Emphases added.) *Id.* § 2-1202(a). Because plaintiff cites no authority requiring a trial court to direct a verdict on its own initiative, this argument is forfeited. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19.

¶ 88       B. The Denial of Plaintiff's Motion for Judgment Notwithstanding the Verdict
¶ 89               1. *Alleged Testimonial Judicial Admissions by Cipolla*
¶ 90        At trial, the parties agreed that the standard of care for an urgent-care physician was identical to the policy in the PromptCare scope of services: to refer the patient to the emergency department if the patient had chest pain that was "suspected" to be of cardiac origin. Also, the parties seemed to agree that the term "suspected" called for an objective standard: what a reasonable urgent-care physician would have suspected under the circumstances if, in examining the patient, the physician had done everything he or she was supposed to do.

¶ 91        According to plaintiff, she elicited testimonial judicial admissions by Cipolla, in her case-in-chief, that dispensed with the need to prove he violated this objective standard of care. She argues he admitted that, when examining Hall on November 10, 2010, he perceived several factors and that these factors were suspicious for a heart attack. Because of such admissions, which plaintiff characterizes as judicial admissions, she claims the trial court erred by denying her motion for judgment notwithstanding the verdict.

¶ 92        Defendants respond, initially, that plaintiff has forfeited this argument because, in the proceedings below, she never requested the trial court to find that Cipolla had made judicial admissions. Actually, in the trial court, plaintiff did claim that Cipolla had made judicial admissions—although she waited until posttrial proceedings to make that claim. On June 6, 2017, she filed a memorandum in support of her motion for judgment notwithstanding the verdict. In her memorandum, she argued that "Dr. Cipolla's admissions constitute[d] judicial admissions that [could not] be contradicted or explained."

¶ 93        Thus, we disagree with defendants that, in the trial court, plaintiff never raised her theory of judicial admissions at all. But we agree with defendants that plaintiff has forfeited her theory of judicial admissions. We find such a forfeiture because, at trial, she acquiesced to and, without objection, participated in a procedure—namely, defendants' presentation of witnesses to prove Cipolla's compliance with the standard of care—that was inconsistent with a theory

- 11 -

that Cipolla already had judicially admitted breaching the standard of care. *Cf. Dauen v. Board of Fire & Police Commissioners of the City of Sterling*, 275 Ill. App. 3d 487, 491 (1995) ("The effect of a judicial admission is to remove the proposition in question from the field of disputed issues.").

¶ 94　　A case from the Second District, *Bituminous Casualty Corp. v. Wilson*, 119 Ill. App. 3d 454 (1983), illustrates how a party can forfeit an objection to a procedure by participating in the procedure without objecting at the time. In *Bituminous Casualty Corp.*, Edward Wilson brought a negligence action against Frisch Contracting Service Company (Frisch), alleging that an employee of Frisch, Jerome Kehl, negligently injured him with an endloader while he, Wilson, was working as a welder for T.C. Bakas & Sons (Bakas). *Id.* at 456. Frisch and its liability insurer, Bituminous Casualty Corporation, then brought a separate action against Wilson for a declaratory judgment that Kehl actually was, at the time of the accident, a loaned employee of Bakas and that Wilson's exclusive remedy for his injuries, therefore, was workers' compensation. *Id.* After a trial in the declaratory judgment action, the trial court agreed with the loaned-employee defense, issued a declaratory judgment against Wilson, and dismissed his negligence action. *Id.* at 458. Wilson filed motions to vacate the judgments, arguing—for the first time—that "it was improper to determine the ultimate issue of the pending negligence suit in the declaratory judgment action." *Id.* at 458-59. In other words, Wilson argued, the question of which company was Kehl's employer—Frisch or Bakas—should have been saved for the underlying negligence action instead of being decided in the declaratory judgment action. The trial court denied both motions, and Wilson appealed. *Id.* at 459.

¶ 95　　The Second District acknowledged that, under *Thornton v. Paul*, 74 Ill. 2d 132 (1978), and *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976), a declaratory judgment was not supposed to decide any ultimate issues of fact posed by the underlying and separate negligence action. *Bituminous Casualty Corp.*, 119 Ill. App. 3d at 459. The trouble was, Wilson "made no such contention in the trial court until his post-trial motion." *Id.* The Second District continued:

> "Throughout most of the trial court proceedings, Wilson acquiesced in the procedure which determined the rights of the parties in the declaratory judgment action. Not until after the trial court had entered its order deciding the issues did Wilson object to the procedure. We conclude that this acquiescence, in effect, invited any error which might inhere in this procedure and precludes Wilson from complaining now." *Id.*

¶ 96　　Similarly, in the present case, plaintiff acquiesced to a procedure that was fundamentally inconsistent with her later-asserted theory of judicial admissions. Again, "[t]he effect of a judicial admission is to remove the proposition in question from the field of disputed issues." *Dauen*, 275 Ill. App. 3d at 491. After her case-in-chief, in which, according to plaintiff, Cipolla judicially admitted breaching the standard of care, plaintiff acquiesced to and, without objection, participated in a procedure that made sense only if Cipolla's observance or breach of the standard of care was *still at issue*. Plaintiff never moved for a directed verdict on the ground that Cipolla had made judicial admissions (she never moved for a directed verdict at all). When defendants called Walter, plaintiff did not object that the subject matter of Walter's expected testimony—*i.e.*, Cipolla's compliance with the standard of care—had been removed from the field of disputed issues. Plaintiff's attorney cross-examined Walter after he opined that Cipolla had met the standard of care. Likewise, when defendants called Craft, plaintiff never objected that judicial admissions by Cipolla had rendered superfluous the expected testimony of Craft

- 12 -

that Cipolla had met the standard of care—and after Craft so testified, plaintiff's attorney cross-examined him, too. One of the questions that plaintiff's attorney asked Craft was as follows: "If Dr. Cipolla suspected that the chest pain might be of cardiac origin, he was obligated, under the rule, regulation, policy, or procedure of OSF's [PromptCare] to refer that patient to the emergency department?" (Craft answered yes.) That question—like many others that plaintiff's attorney asked Walter and Craft—presupposed that Cipolla's compliance with the standard of care was still in the field of disputed issues, despite the alleged judicial admissions Cipolla made in plaintiff's preceding case-in-chief.

¶ 97     Like Wilson in *Bituminous Casualty Corp.*, plaintiff waited until posttrial proceedings to raise a legal theory—after forging ahead, without objection, in a trial that was inherently inconsistent with that theory. It was like waiting to see how the trial turned out before making an argument that the central issue in the trial really should not have been decided in the trial, after all. Plaintiff's theory of judicial admissions is forfeited. See *Bituminous Casualty Corp.*, 119 Ill. App. 3d at 459.

¶ 98     Even if, by her acquiescence at trial, plaintiff had not forfeited her theory of judicial admissions, her theory lacks merit. Cipolla made *evidentiary* admissions, which he explained and qualified, but he did not make *judicial* admissions. See *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998) ("Ordinary evidentiary admissions may be contradicted or explained.").

¶ 99     Before explaining why we classify Cipolla's admissions as evidentiary rather than judicial, we should identify the applicable standard of review.

¶ 100    When a party appeals the ruling on a motion for judgment notwithstanding the verdict, our standard of review is clear. We review the ruling *de novo*, asking the same question a trial court would ask (*Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 48 (1998)): whether "the evidence and inferences therefrom, viewed in the light most favorable to the nonmoving party, so overwhelmingly favor[ ] the movant that no contrary verdict based on that evidence could ever stand" (*Ries v. City of Chicago*, 242 Ill. 2d 205, 215 (2011)).

¶ 101    The standard of review is less clear when the question is whether the trial court should have treated a statement as a judicial admission. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 90. Some cases ask whether the court abused its discretion. *Shelton v. OSF Saint Francis Medical Center*, 2013 IL App (3d) 120628, ¶ 23; *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011). Other cases, including cases from the Fourth District, apply a *de novo* standard of review. *Buchanan v. Legan*, 2017 IL App (3d) 170037, ¶ 32; *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 132; *Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 360 (2009).

¶ 102    We infer that the supreme court likewise would apply a *de novo* standard of review to the question of whether a party made a judicial admission. We draw this inference because the supreme court has held that (1) a ruling on a motion to dismiss for failure to state a cause of action (*Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009)) or on a motion for judgment on the pleadings (*Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005)) should be reviewed *de novo* and (2) judicial admissions should be considered in this *de novo* review (*Pooh-Bah Enterprises, Inc.*, 232 Ill. 2d at 473; *Gillen*, 215 Ill. 2d at 385). For the standard of review to be, as the supreme court held, purely *de novo*, the reviewing court would have to make a subsidiary *de novo* determination of whether a judicial admission exists in the record. (Otherwise, the standard of review would be mixed.) In accordance with those decisions by the supreme court and our own decisions in *Hancock* and

- 13 -

*Herman*, we will apply a *de novo* standard of review to the question of whether testimonial statements by Cipolla were judicial admissions.

¶ 103    Plaintiff claims that Cipolla made the following judicial admissions in his testimony.

¶ 104    a. The History of Chest Pain and Occasional Cramping of the Neck and Arm

¶ 105    On November 10, 2010, Hall entered PromptCare and told Shay he had chest pain and also that he sometimes had cramping in his neck and arm. Plaintiff's attorney asked Cipolla on direct examination: "Was the history a suspicion to you of a potential cardiac connection to the chest pain?" Cipolla answered: "Yes." Plaintiff characterizes this answer as a judicial admission.

¶ 106    Case law holds, however, that a testimonial judicial admission cannot be an opinion; it has to be an admission of a "concrete fact." *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 671 (1992); *Deichmiller v. Industrial Comm'n*, 147 Ill. App. 3d 66, 73 (1986). "[C]oncrete" means "existing in a material or physical form"; it "denot[es] a material object as opposed to an abstract quality, state, or action." The New Oxford American Dictionary (2d ed. 2005). Whether a patient's history raised a suspicion of a potential heart attack is an opinion, not a concrete fact, and testimonial opinions are not judicial admissions (See *Bishop v. Crowther*, 92 Ill. App. 3d 1, 12-13 (1980)). *Cf. Caponi*, 236 Ill. App. 3d at 671 (a witness's testimony that a brake pedal "was all the way to the top and would not move down at all and that he had his foot on the brake pedal the entire time[,] trying to depress it" was a judicial admission because it was unequivocal and "the condition of the brake pedal before the collision was not an opinion, estimate, or inference, but[,] rather[,] was an observed fact solely within [his] knowledge").

¶ 107    A second problem with characterizing Cipolla's answer as a judicial admission is that the concrete fact must be "within the party's *peculiar* knowledge" (emphasis added) (*Deichmiller*, 147 Ill. App. 3d at 73; see also *Boyd v. United Farm Mutual Reinsurance Co.*, 231 Ill. App. 3d 992, 998 (1992)) or "*solely* within [his] knowledge" (emphasis added) (*Caponi*, 236 Ill. App. 3d at 671). A standard of care is *shared* knowledge within a profession, not knowledge peculiar to any one physician. Plaintiff's theory is that Cipolla acted inconsistently with such shared knowledge. If Cipolla *alone* knew that chest pain and occasional cramping of the neck and arm were suspicious for a potential cardiac disorder—if this knowledge were peculiar to him—it would not have been shared knowledge and, hence, would not have been a standard of care.

¶ 108    A third problem is that a judicial admission can be found only if "a party's testimony, taken as a whole, is unequivocal." *Dunning v. Dynegy Midwest Generation, Inc.*, 2015 IL App (5th) 140168, ¶ 50. Although Cipolla answered " 'yes' " to the question "Was the history a suspicion to you of a potential cardiac connection to the chest pain?" he further testified that his examination of Hall, the answers Hall gave to his questions, and the electrocardiogram dispelled the suspicion.

¶ 109    As the trial court said, the meaning of "suspicion" was for the jury to decide. Apparently, in the jury's view, the suspicion that counted was the suspicion that persisted after the medical examination. This view has commonsense appeal because when a patient who has suffered no apparent external trauma to the chest walks into an urgent-care facility and complains of chest pain, the suspicion of a heart attack will be aroused immediately. A "suspicion" is "a state of mental uneasiness and uncertainty" (Merriam-Webster's Collegiate Dictionary (10th ed. 2000)), and a complaint of chest pain, *ipso facto*, will evoke that mental state. That is precisely why the patient is administered an electrocardiogram. But if this preliminary suspicion were

enough to justify sending the patient to the emergency department, the receptionist could do that, and the urgent-care physician would be superfluous—as would be the electrocardiograph with which the urgent-care facility is equipped.

¶ 110    The experts appeared to agree that some further analysis might well be necessary when a patient walks in complaining of chest pain. After all, plaintiff's own expert, Jacobs, testified:

"A. Well, Mr. Hall proceeded to PromptCare that evening with complaints of pain in his left, upper chest. He had also mentioned to the first person who received him that he had cramping in his neck and arm sometimes. Those kinds of symptoms are *concerning*. They raise red flags: Could this be visceral pain from decreased blood supply to the heart? *Does it immediately pop*? *No*, *but then other questions need to be asked*: When did the pain begin? How severe was the pain? How long did it last? Did it just start one hour before he came in after lifting metal that day[,] or had he had it all day?" (Emphases added.)

Thus, when a patient comes into PromptCare complaining of chest pain and occasional cramping of the neck and arm, that in itself is concerning for a potential heart attack. Nevertheless, those symptoms do not immediately pop as "suspicion" within the meaning of the scope of services. Examination and analysis by the urgent-care physician are necessary. Questions need to be asked. The electrocardiogram needs to be scrutinized. Jacobs admitted that the use of an electrocardiograph "was appropriate in this case" (although he disagreed with Cipolla's interpretation of the electrocardiogram). Defendants' attorney asked Jacobs:

"Q. And the doctor must make an interpretation of that; correct?

A. Yes.

Q. And the doctor must use his brain and his training and experience to decide whether or not there should be a suspicion of cardiac origin to the presentation; correct?

A. He is entitled to do that, yes[.]"

As a matter of fact, the urgent-care facility where Jacobs worked was equipped with an electrocardiograph, and he made use of it in his practice.

¶ 111    b. Finding One More Suspicion After Administering the Electrocardiogram

¶ 112    Plaintiff's attorney asked Cipolla:

"Q. And I think you told me that if you found anymore [*sic*] suspicion after taking the EKG [(electrocardiogram)] that you should refer him to the emergency room, correct?

A. Yes."

¶ 113    What Cipolla hypothetically "should" have done was an opinion instead of a concrete fact and, thus, was not a judicial admission. See *Caponi*, 236 Ill. App. 3d at 671; *Deichmiller*, 147 Ill. App. 3d at 73. Nor was it knowledge peculiar to Cipolla. See *Caponi*, 236 Ill. App. 3d at 671; *Deichmiller*, 147 Ill. App. 3d at 73. And, again, there is the problem of cherry-picking as opposed to a fair account of Cipolla's testimony as a whole. See *Dunning*, 2015 IL App (5th) 140168, ¶ 50. Plaintiff cherry-picks Cipolla's admissions that hypertension and tachycardia *could be* additional suspicions, but plaintiff leaves behind Cipolla's explanations of why, in his judgment, those things ultimately *were not* suspicious under the circumstances. Although Cipolla agreed with plaintiff's attorney that "[h]ypertension *can be* a suspicion," he noted that Hall had never been diagnosed with hypertension, and he regarded the blood pressure of 134

- 15 -

over 98 as "[m]ild elevation related to his pain." (Emphasis added.) Similarly, although Cipolla agreed with plaintiff's attorney that "[t]achycardia [(an elevated heart rate)] *can be* a suspicion for chest pain being connected to the heart," Hall had only "[m]ild tachycardia" "related to the pain." (Emphasis added.)

¶ 114                            c. T-Wave Inversions in the Electrocardiogram

¶ 115    Plaintiff cites Cipolla's testimony that, in Hall's electrocardiogram, he saw T-wave inversions and that a T-wave inversion "*can be* a sign of cardiac ischemia," *i.e.*, damage to the heart from the obstruction of inflowing blood. (Emphasis added.) Plaintiff presents this testimony as another judicial admission by Cipolla. We are unconvinced. An opinion is not a judicial admission. *Caponi*, 236 Ill. App. 3d at 671; *Deichmiller*, 147 Ill. App. 3d at 73. And, besides, Cipolla offset this opinion with a further opinion. See *Dunning*, 2015 IL App (5th) 140168, ¶ 50. He testified that electrocardiograms needed to be interpreted by a physician, not by a computer, and that when Hall's electrocardiogram was interpreted as a whole, the T-wave inversions were not suspicious for ischemia—an interpretation with which a cardiologist, Craft, agreed in his testimony.

¶ 116                        d. Positive for Chest Pain in the Cardiovascular System

¶ 117    Plaintiff's attorney questioned Cipolla about notations he made in the medical record when examining Hall. He examined Cipolla as follows:

"Q. ***

*** You have listed there cardiovascular. That's a review of the systems. And you have that his heart system is positive for chest pain, don't you?

A. That was his complaint.

Q. Okay. So you're saying his complaint and your review of systems is he was, you're saying he is positive for chest pain in the cardiovascular system?

A. Yes.

Q. Okay. That's a suspicion, isn't it?

A. Yes."

¶ 118    Plaintiff presents this testimony as another judicial admission by Cipolla—but, actually, it is not a judicial admission because one can only *infer* the existence of someone else's pain and an inference is not a concrete fact (see *Hancock*, 2014 IL App (4th) 131069, ¶ 132). It is impossible to directly experience someone else's pain as a concrete fact. For example, if someone says, "My chest hurts," one can only infer that what he feels corresponds to what he says. Or if someone winces when palpated, one can only infer from his behavior that he feels pain. "Inferences, appearances, and opinions do not qualify [as judicial admissions]." *Id.* So, this was, at best, another evidentiary admission instead of a judicial admission.

¶ 119    Unlike judicial admissions, evidentiary admissions may be contradicted or explained. *Rennick*, 181 Ill. 2d at 406. Hall's being "positive for chest pain in the cardiovascular system" was, Cipolla admitted, "a suspicion." But he explained that his examination of Hall tended to dispel the suspicion in that (1) the chest pain was in the upper left chest instead of mid-sternum and (2) the chest pain was reproducible by palpation.

¶ 120    e. Defendants' Memorandum in Opposition to Plaintiff's
Motion for Judgment Notwithstanding the Verdict

¶ 121    In their memorandum in opposition to plaintiff's motion for judgment notwithstanding the verdict, defendants wrote: "There is no doubt that Dr. Cipolla conceded that certain *isolated* factors uncovered during the history, exam[,] and EKG on Jason Hall were suspicious for chest pain of a cardiac origin." (Emphasis added.) Plaintiff argues that this statement, too, "should be considered a binding judicial admission."

¶ 122    It is not much of an admission when it is returned to the context from which it was selectively lifted. Alleged judicial admissions must be considered in their context. *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 468 (2009). The sentence that plaintiff quotes was part of a larger discussion, the point of which was that when the individually suspicious factors were viewed with all the evidence instead of in isolation, they lost their suspiciousness. Defendants wrote:

> "[W]hat [p]laintiff seems to fail to understand—but the jury correctly understood—is that the standard of care did not require Dr. Cipolla to transfer Jason Hall to the emergency department simply because one or more isolated pieces of evidence may have been suspicious for cardiac chest pain. Medical decisions, like the jury's decision in this case, are based on all of the evidence taken as a whole. ***
>
> *** When considering all of the evidence, the jury would have also considered the evidence indicating that severe coronary artery disease is extremely rare in a 34-year-old man that was active, not morbidly obese, not diabetic, not diagnosed with hypertension and had no cardiac history. The jury would have also considered the evidence that Jason Hall had reproducible chest pain and pain that had been persistent for several hours, which is highly inconsistent with chest pain of cardiac origin. Such evidence allowed a reasonable juror to resolve the question of liability in favor of [d]efendants."

Thus, ultimately, the only thing defendants clearly admitted in their memorandum was that factors such as chest pain, regarded in the abstract and in isolation, aroused a suspicion of a cardiac problem—until Cipolla learned that the chest pain had lasted several hours and was reproducible on palpation and that the patient was an active 34-year-old with no history of physical ailments or conditions that tended to undermine the heart. An alleged admission "must be given a meaning consistent with the context in which it was found." *Id.*

¶ 123    2. *Certainty Versus Suspicion*

¶ 124    Plaintiff's attorney asked Cipolla:

> "Q. All right, Doctor, have you ever made this statement[:] 'I would be required to refer to the [emergency room] only if I would suspect with certain degree of certainty that the patient was having an event.' Have you ever said that?
>
> A. Most likely, yes.
>
> Q. And did you ever clarify that statement further by saying, 'Because putting everything together at the time, I did not suspect that he was having a cardiac event?'
>
> A. Yes.
>
> Q. You said that[,] too, right?
>
> A. Yes.

Q. Now can we agree, a standard requiring a certain degree of certainty is much different than a standard requiring only any suspicion whatsoever; would you agree with that?

A. Yes.

* * *

Q. *** [O]n [November 10, 2010,] if you believed you only were required to refer [Hall] to the [emergency room] if you had a degree of certainty he was having a cardiac event, that would not be consistent with OSF's scope of services standard of care for chest patients; was it?

A. I was not suspicious at all.

* * *

Q. *** My question is, if you in fact did not refer [Hall] to the [emergency room] because you used a degree of certainty of a heart attack standard rather than the scope of services standard, you would have violated the standard?

A. Yes."

¶ 125    Plaintiff argues: "This is yet another admission by Dr. Cipolla that he violated the actual standard of care applicable to him when he failed to transfer [Hall] to the [emergency department]." We disagree. By misstating the standard of care in his deposition, Cipolla did not admit he violated it.

¶ 126                              3. *Denton's Opinion*

¶ 127    The forensic pathologist, Denton, opined that "[Hall's] heart findings [were] consistent with having a heart attack at [the] time [he went to OSF PromptCare, on November 10, 2010]." Plaintiff argues: "This is definitive, objective evidence from a third[-]party occurrence witness that [Hall] was indeed having chest pain of a cardiac origin when Dr. Cipolla treated him in the OSF PromptCare."

¶ 128    The dispositive issue, however, was not whether Hall was having a heart attack when he visited PromptCare. Instead, the dispositive issue was whether a reasonably careful urgent-care physician would have suspected that Hall was having a heart attack, given his medical history, known family history, age, symptoms, vitals, and electrocardiogram. The experts differed on that issue, and it was up to the jury to decide which experts to believe.

¶ 129    The trial in this case was a typical battle of the experts: Cipolla, Walter, and Craft against Jacobs, MacRae, and Schroeder. The jury was free to find the opinions of Cipolla, Walter, and Craft to be more credible than those of Jacobs, MacRae, and Schroeder. See *Hardy v. Cordero*, 399 Ill. App. 3d 1126, 1132 (2010) (jury entitled to believe one expert over another). When reviewing the ruling on a motion for judgment notwithstanding the verdict, we look at all the evidence in the light most favorable to the opposing party, and that means deferring to the jury's decision to believe some witnesses over others. See *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 208 Ill. 2d 259, 274 (2003). It would be an exaggeration to say that the evidence, viewed in its aspect most favorable to defendants, so overwhelmingly favors plaintiff that a verdict in defendants' favor could never stand. See *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). Therefore, we uphold the denial of plaintiff's motion for judgment notwithstanding the verdict.

¶ 130                    C. The Denial of Plaintiff's Motion for a New Trial

¶ 131         The trial court should grant a motion for a new trial only if (1) the verdict is against the manifest weight of the evidence (*Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38) or (2) a trial error or an accumulation of trial errors prejudiced the movant or unduly affected the outcome of the trial (*Dupree v. County of Cook*, 287 Ill. App. 3d 135, 145 (1997)). A verdict is against the manifest weight of the evidence only if it is clearly evident that the jury should have reached the opposite result or only if the jury's findings are unreasonable, arbitrary, and not based on any of the evidence. *Lawlor*, 2012 IL 112530, ¶ 38.

¶ 132         We disagree that the verdict in defendants' favor meets that description in *Lawlor*. The record contains evidence to support the verdict, namely, the expert opinions of Cipolla, Walter, and Craft. Even though Cipolla made the evidentiary admissions that plaintiff identifies, he explained them, and the jury was free to accept his explanations. See *Rennick*, 181 Ill. 2d at 406 ("Ordinary evidentiary admissions may be contradicted or explained.").

¶ 133         Because we are unconvinced that the evidence clearly called for a verdict in plaintiff's favor (see *Lawlor*, 2012 IL 112530, ¶ 38), we will consider plaintiff's alternative argument that serious and prejudicial errors entitle her to a new trial (see *Dupree*, 287 Ill. App. 3d at 145). She identifies the following alleged errors, and our standard of review is whether the trial court abused its discretion by denying a new trial when it was confronted with these alleged errors. *Aguilar-Santos v. Briner*, 2017 IL App (1st) 153593, ¶ 46; *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 111. The answer is no because, as we will explain, the claims of error lack merit or they are procedurally forfeited.

¶ 134         Let us take the alleged errors one at a time.


¶ 135                         1. *The Trial Court's Refusal to Admit the*
                          *Emergency Department's Chest Pain Protocol*

¶ 136         Plaintiff argues that the trial court abused its discretion by refusing to admit the chest pain protocol. Specifically, plaintiff claims that the following passage in the chest pain protocol was relevant:

> "Patients presenting to the [emergency department] with complaints of chest pain have the [c]hest [p]ain [c]are [p]rofile initiated. After evaluation by the [emergency department] physician, there are certain low[-]risk patients who may be deemed appropriate for observation in the [clinical decision unit]. These patients will be observed in the [c]linical [d]ecision [u]nit for a minimum of 4 hours and up to 23 hours."

Even though the chest pain protocol discusses "[p]atients presenting to the [emergency department]" instead of patients presenting to PromptCare, plaintiff maintains that the chest pain protocol was nevertheless relevant because it showed that OSF intended patients with chest pain to be treated in the emergency department, in accordance with the now-lost chest pain care profile, instead of being treated in PromptCare. Plaintiff points out that, even on its web page, OSF announced that PromptCare was for "minor illnesses and injuries" and that, "[f]or more severe problems, such as chest pain, *** you should seek treatment in the OSF St. Joseph Medical Center Emergency Department." Plaintiff reasons:

> "This evidence represents OSF's institutional mandate[,] supported by its written policies and procedures, that chest pain is a severe problem not to be treated in its

PromptCare facility, but rather across the hall[,] in its [emergency department]. This makes it part of the standard of care applicable to the care and treatment of [Hall,] who presented with chest pain to the PromptCare facility and was not directed or transferred across the hall to OSF's [emergency department] consistent[ly] with these prescribed procedures and protocol."

¶ 137 But the chest pain protocol does not state that every patient with chest pain must be treated in the emergency department instead of in PromptCare. It only discusses what to do with "[p]atients presenting to the [emergency department] with complaints of chest pain." Because Hall was not a patient presenting to the emergency department with complaints of chest pain, it was reasonable of the trial court to rule that the chest pain protocol was irrelevant. See *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519, ¶ 90 ("[R]eviewing courts will not disturb a trial court's evidentiary rulings absent an abuse of discretion."); *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 64 ("The abuse of discretion standard is the most deferential standard of review [citation], and[,] as such, a ruling will only be deemed an abuse of discretion where it is unreasonable and arbitrary or where no reasonable person would take the view adopted by the circuit court [citations].").

¶ 138 2. *Cipolla's Discharge Instruction to*
*Follow Up With the Primary-Care Physician*

¶ 139 On November 10, 2010, Cipolla issued discharge instructions to Hall, in which he diagnosed "chest wall pain" and prescribed aspirin, Darvocet, "[r]est, fluids, [and] follow[ing] up with Dr. Sheppard," Hall's primary-care physician.

¶ 140 On January 17, 2017, plaintiff filed a motion *in limine*, in which she requested the trial court to bar any evidence of Hall's comparative negligence, since defendants had never pleaded comparative negligence as an affirmative defense. The court granted the motion.

¶ 141 On January 30, 2017, plaintiff filed another motion *in limine*, which was titled "Plaintiff's Motion in Limine To Bar Any Reference to Jason Hall's Failure To Follow Up With His Physician." The motion stated that although the trial court previously barred defendants from presenting any evidence of comparative negligence, "[d]efendants ha[d] indicated that they [might] raise the issue of [Hall's] failure to follow[ ]up with his primary care physician." The motion sought to bar defendants from raising that issue "in the presence of the jury, directly or through the presentation of evidence, by argument or by innuendo." Again, the reason for the motion was that defendants had never pleaded the affirmative defense of comparative negligence.

¶ 142 On January 31, 2017, after *voir dire* but before opening statements, the trial court heard arguments on plaintiff's motion *in limine* of January 30, 2017. Plaintiff's attorney argued that because of defendants' failure to plead comparative negligence, the court should bar them not only from arguing to the jury that Hall "didn't go to see his family physician" but also from making any "reference to sending him to his family doctor."

¶ 143 In response, defendants' attorney said he intended, in his opening statement, merely to "go through the chronology," part of which was (1) Hall "was given instruction to follow up" and (2) there was "no evidence that he sought medical care between the time he left with that instruction and the time he passed [away,] on [December 6, 2010]." Defendants' attorney

assured the trial court: "That's all. I'm not going to say anything about fault in any way, shape[,] or form."

¶ 144 Plaintiff's attorney was not reassured. He argued: "That's why we have motions *in limine*. It's innuendo that there's fault, and it can't be relevant unless there is fault, and that is an affirmative defense that has not been pled."

¶ 145 The trial court decided: "I'm standing by the prior ruling that I made and allowing [defendants' attorney] to reference those things that he's just put on the record[,] in his opening statement."

¶ 146 Plaintiff argues that the trial court thereby abused its discretion. See *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007) ("Our standard of review of a trial court's decision to grant or deny a motion *in limine* is the abuse of discretion standard.").

¶ 147 Defendants claim, however, that plaintiff has forfeited this issue by failing to make an objection at any point in the trial itself. For instance, plaintiff never objected when defendants' attorney asked Cipolla:

"Q. You gave [Hall] discharge instructions to follow up with his family physician?

A. Yes, I did.

Q. Why?

A. Custom and practice. We always want our patient, patient coming into urgent care, patient not—for me[,] I'm not his primary care. We advise them to check back and follow up with primary, 7 to 10 days is the time frame. That's what I did.

Q. You gave him written instructions; is that true?

A. Yes.

\* \* \*

Q. So that's the one with [']follow up with Dr. Sheppard[']?

A. Yes."

¶ 148 The supreme court has held that "[w]hen a motion *in limine* is denied [in a civil case], a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review." (Internal quotation marks omitted.) *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002). We agree that by failing to make a contemporaneous objection, plaintiff has forfeited the issue of whether the trial court erred by allowing testimony that Cipolla had instructed Hall to follow up with his primary-care physician within 7 to 10 days. See *id.*

¶ 149 *3. Plaintiff's Claim of Surprise From Guth's Trial Testimony and the Alleged Denial of Plaintiff's Right to Impeach Her*

¶ 150 On November 1, 2012, in a document titled "Defendants' Rule 213(f)(1) and (2) Disclosure," defendants disclosed to plaintiff the witnesses they might call at trial. Janet Guth was not on the list. The disclosure stated, however: "Defendants reserve the right to call at trial any lay witness previously identified by [p]laintiff or identified by [p]laintiff in the future."

¶ 151 On January 6, 2017, plaintiff took a supplemental discovery deposition of Guth.

¶ 152 On January 17, 2017, plaintiff served on defendants a notice pursuant to Illinois Supreme Court Rule 237(b) (eff. July 1, 2005) to "produce \* \* \* Janet Guth the second week of trial."

¶ 153 On January 20, 2017, in a document titled "Statement of the Case and Witness List," plaintiff disclosed Guth as a "[person] who may be called to testify at this trial." Guth thereby became a "lay witness *** identified by [p]laintiff in the future."

¶ 154 On January 30, 2017, the day before trial, plaintiff filed a "Motion To Bar Janet Guth in Defendants' Case in Chief." The motion alleged that, "[f]or the first time," on January 27, 2017, defendants' attorney notified plaintiff's attorney, by e-mail, that defendants intended to call Guth in their case-in-chief. The motion complained that defendants had never before disclosed Guth as a witness for the defense and that their late disclosure violated the final pretrial order of November 4, 2016. That order had required defendants to provide plaintiff a list of witnesses in the final pretrial conference, held on January 23, 2017. The motion argued: "And even though plaintiff disclosed Janet Guth as a potential rebuttal witness, that does not allow defendants to call Janet Guth in their case in chief to testify to matters that defendants never disclosed."

¶ 155 On January 30, 2017, the trial court heard arguments on plaintiff's motion to bar defendants from calling Guth as a witness. Plaintiff's attorney made the arguments he had made in his motion. Defendants' attorney responded:

"He's known about this witness. We gave him the deposition, second deposition at his request, and as soon as we learned that now [']maybe I won't use [her,'] we said, ['W]ell, we'll put that evidence on that you just received from Ms. Guth.[']

*** There's no surprise here at all whatsoever in having her now testify as to what information he gathered from her in this recent deposition."

¶ 156 Plaintiff's attorney countered:

"But we don't know exactly what she's going to testify to. You know, if it's just when Dr. Cipolla initially got into the electronic medical record and started making his recordings, his charting in this case, and when he got out, if it's just limited to that, that's one thing. But there's a lot of other information that she could testify to, and we don't know what it is. You have to disclose that well in advance, not on a Friday before a Monday trial."

¶ 157 Defendants' attorney promised the trial court that Guth's testimony at trial would be the same as her testimony in her discovery depositions and there would be "nothing else." It would be "exactly what [plaintiff's attorney had] questioned her about" in the depositions. "That's why this is no surprise," he argued.

¶ 158 The trial court ruled:

"THE COURT: All right. Well, we do have the disclosure rule, and the purpose of a disclosure rule is so that there is no surprise at the time of trial. I did note[,] in reviewing the documents[,] that defendant had specifically reserved the right to call any of plaintiff's disclosed witnesses at the time of trial in at least one or more of their disclosures. Janet Guth is not a surprise in this case insofar as what information she has provided either through written discovery [or through] the two depositions that she gave. So[,] to the extent that that is no surprise to either side, I will deny the motion, but her testimony will be limited to what has been previously disclosed in this case."

¶ 159 Plaintiff claims to have been unfairly surprised when Guth testified, in the trial, that "there [was] an option in family history for them to choose 'none.'" Hall's computerized medical records showed "none" for family history. Plaintiff sought to convince the jury that "none" was

- 22 -

a default entry made by the software and, thus, was not necessarily documentary evidence that Cipolla really asked Hall if his family had a history of cardiac disease. To nail that point home, plaintiff's attorney addressed this issue to Guth at trial:

> "Q. So we know that that either was a default setting that the computer automatically put into that category for family history, we know either that, or, potentially, nobody asked about family history, and that's why 'none' was selected.

> A. Or, as I just stated a little bit ago, there is an option in family history for them to choose 'none,' 'none known,' and that displays as 'none' as well."

¶ 160     This was the testimony that plaintiff characterizes as surprising. Plaintiff claims that this answer by Guth contradicted her testimony in one of her depositions and that the trial court abused its discretion by refusing to allow plaintiff to impeach Guth with the contradictory deposition testimony. See *Keller v. State Farm Insurance Co.*, 180 Ill. App. 3d 539, 551 (1989). In her brief, plaintiff purports to quote from pages 65 to 66 of the deposition. The purported quotation, however, is unaccompanied by any citation to the record because neither of Guth's depositions are in the record.

¶ 161     In her reply brief, plaintiff represents to us that "the limited pages of [Guth's] deposition that the trial court reviewed when [plaintiff] attempted to impeach her testimony are set forth verbatim in the record [citation] and should be considered by this [c]ourt." Again, however, plaintiff is inviting us to take her word for it: she cites her own posttrial memorandum, in which she purports to quote from Guth's deposition. Plaintiff cannot substantiate her own representation with another of her own representations.

¶ 162     Any argument unsubstantiated by citation to the record is forfeited. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 32; *In re Marriage of Stephenson*, 2011 IL App (2d) 101214, ¶ 45. Plaintiff had the responsibility, as the appellant, to arrange for us to receive a record adequate to the issues she intended to raise in her appeal, and any doubts arising from the incompleteness of the record must be resolved against her. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). It appears, from the trial transcript, that before sustaining defendants' objection to the attempted impeachment, the court reviewed as many as three pages of Guth's deposition—at least, defendants' attorney remarked to the court: "It goes on for three pages." Because we lack the transcript of whichever of Guth's depositions the court reviewed, we can only presume that what Guth said in her deposition was not materially inconsistent with what she later said at trial. See *id.*; *Keller*, 180 Ill. App. 3d at 551.

¶ 163     The omission of Guth's depositions from the record also hinders us in our consideration of the discovery issue—that is, plaintiff's claim of unfair surprise. Here is why. Under Illinois Supreme Court Rule 213(g) (eff. Jan. 1, 2007), "[i]nformation disclosed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in the discovery deposition." The real question regarding Guth is whether plaintiff previously was provided the information to which she testified at trial, not whether defendants made a timely disclosure of her as a witness. By notifying plaintiff, on November 1, 2012, that they "reserve[d] the right to call at trial any lay witness *** identified by [p]laintiff in the future," defendants disclosed Guth as a lay witness for the defense (see Ill. S. Ct. R. 213(f)(1) (eff. Jan. 1, 2007))—or, at least, plaintiff does not explain why this disclosure would have been insufficient as a disclosure of Guth's identity as a defense witness. In addition to her identity as a lay witness for the defense, defendants had to disclose "the

subjects on which [Guth would] testify." *Id.* Without her discovery depositions, we cannot tell whether any of the information she provided at trial was new information, *i.e.*, information not to be found in her discovery depositions. See Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). Hence, we fall back on the default assumption that the trial court ruled correctly. See *Foutch*, 99 Ill. 2d at 391-92.

¶ 164                  4. *The Refusal of Plaintiff's Proposed Jury*
                       *Instruction on the Similar-Locality Rule*

¶ 165     Plaintiff claims that the trial court abused its discretion by refusing her proposed jury instruction on the similar-locality rule (IPI Civil No. 105.01). See *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶ 119 ("Jury instructions are reviewed under the abuse of discretion standard ***.").

¶ 166     Under the similar-locality rule, a physician's conduct is judged by the standard of care of a reasonably well-qualified physician practicing in the same or a similar community. *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986). We have held:

> "[A] party may invoke the 'similar locality' rule *only* when a question exists regarding the inequality of medical facilities and conditions, such as the availability of facilities for examination and treatment of the patient or the presence of a specialist, which would make it unfair to hold a physician practicing in a small, rural community to the same standard of care as a physician practicing in an urban environment where specialized care facilities are readily available." (Emphasis in original.) *Jackson v. Graham*, 323 Ill. App. 3d 766, 776 (2001).

¶ 167     PromptCare is not an unequal medical facility in a small, rural community. Therefore, we find no abuse of discretion in the refusal of plaintiff's proposed jury instruction on the similar-locality rule. See *id.*; *Jacobs*, 2017 IL App (1st) 151107, ¶ 119.

¶ 168          5. *The Refusal to Excuse Two Prospective Jurors Whom Cipolla Had Treated*

¶ 169     Plaintiff asked the trial court to excuse two prospective jurors, Brandy Redman and Jacklyn Morris, for cause because they had used PromptCare and might have been treated by Cipolla. The court denied the request, and plaintiff argues the court thereby erred.

¶ 170     A party may challenge a prospective juror for cause, or alternatively, a party may remove a prospective juror by a peremptory challenge. *People v. Bowens*, 407 Ill. App. 3d 1094, 1098 (2011). As the name suggests, a challenge for cause asserts a reason why the prospective juror is unqualified to serve, such as bias or prejudice. *Id.* A peremptory challenge, by contrast, need not be supported by a reason. *Id.* Statutory law provides that, in a civil case, "[e]ach side shall be entitled to [five] peremptory challenges" (735 ILCS 5/2-1106(a) (West 2016)), but there is no limit on the number of challenges for cause (*id.* § 1105.1).

¶ 171     "This court has repeatedly stated that 'we will review the trial court's ruling on a challenge for cause only when an objectionable juror was forced upon a party *after* it had exhausted its peremptory challenges.' " (Emphasis in original.) *Bowens*, 407 Ill. App. 3d at 1099-1100 (quoting *Grady v. Marchini*, 375 Ill. App. 3d 174, 179 (2007)). Neither Morris nor Redman was forced upon plaintiff. Plaintiff accepted Morris while having five unused peremptory challenges, and plaintiff removed Redman by a peremptory challenge. It follows that plaintiff has waived her challenge to Morris. See *id.* As for Redman, plaintiff does not explain how she

suffered any prejudice, considering that after the trial court declined to remove Redman for cause, plaintiff removed her by a peremptory challenge—the first of five to which plaintiff was entitled.

¶ 172                                          III. CONCLUSION

¶ 173        In our *de novo* review of all the evidence in the light most favorable to defendants, we are unable to say the evidence so overwhelmingly favors plaintiff that, in the view of reasonable persons, a verdict in defendants' favor could never stand. See *Pedrick*, 37 Ill. 2d at 510; *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 167 (2003). Nor are we able to say the trial court abused its discretion by denying plaintiff's motion for a new trial. See *Lawlor*, 2012 IL 112530, ¶ 38. Therefore, we affirm the judgment.

¶ 174        Affirmed.